NOTE—Reported at 387 N.E.2d 474.

ORTHO PHARMACEUTICAL CORPORATION *v.* DOROTHY M. CHAPMAN.

[No. 1-877A169. Filed March 29, 1979. Rehearing denied with *Order* May 2, 1979. Transfer denied November 27, 1979.]

*William P. Wooden, Douglas B. King, Wooden, Stark, McLaughlin & Sterner*, of Indianapolis, *Robert W. Sparks, Johnson & Johnson*, of New Brunswick, New Jersey, *McFaddin & McFaddin*, of Rockville, for appellant.

*Clelland J. Hanner, John E. Dowd*, of Rockville, for appellee.

YOUNG, J.— The appellee, Dorothy Chapman, brought suit against the appellant, Ortho Pharmaceutical Corporation, for personal injury suffered by her as a result of taking Ortho-Novum, an oral contraceptive manufactured by the appellant. Her complaint alleged liability on the

theories of negligence, strict tort liability under RESTATEMENT (SECOND) OF TORTS § 402A (1965), and breach of warranty for Ortho's failure to adequately warn of the risk of thrombophlebitis attendant on use of Ortho's oral contraceptive. Judgment was entered upon a jury verdict in favor of Chapman, from which Ortho brings this appeal.

Ortho has raised numerous issues which will be dealt with as they arise in the course of our determination of the following major issues:

I.   Whether the trial court erred in denying Ortho's motion for judgment on the evidence, challenging the sufficiency of evidence with respect to the inadequacy of the warnings and with respect to proximate cause.

II.   Whether the trial court erred in refusing to give Ortho's tendered instructions numbered 2, 3, 6, 7, 9 and 10, in giving Chapman's tendered instructions numbered 2, 3, 4, 8, 9 and 10, and in the court's instructions numbered 1 and 3.

III.   Whether the trial court committed reversible error in admitting into evidence a Federal Drug Administration-mandated "Patient Warning" which was not in use until August of 1970, in admitting an Ortho-Novum 2 mg. package insert dated January, 1970, and in admitting an advertisement of Ortho-Novum from a medical periodical published after Chapman's doctor prescribed Ortho-Novum for Chapman.

I.

Because Ortho offered evidence on its own behalf, any error in overruling Ortho's motion for judgment on the evidence at the close of Chapman's case-in-chief is waived. *Lamb v. York* (1969), 252 Ind. 252, 247 N.E.2d 197; *Meadowlark Farms, Inc. v. Warken* (1978), 176 Ind.App. 437, 376 N.E.2d 122; Ind. Rules of Procedure, Trial Rule 50(A). Therefore we need only review the propriety of the trial court's denial of Ortho's motion for judgment on the evidence at the close of all the evidence.

The rule in Indiana with respect to motions pursuant to TR. 50, for judgment on the evidence, is that such a motion may properly be granted only if there is no substantial evidence or reasonable inference derived therefrom supporting an essential element of the claim: a complete failure of proof. When considering a motion for judg-

ment on the evidence, the trial court must consider only the evidence and reasonable inferences favorable to the non-moving party. *Huff v. Travelers Indem. Co.* (1977), 266 Ind. 414, 363 N.E.2d 985; *American Turners of South Bend v. Rodefer* (1978), 175 Ind.App. 487, 372 N.E.2d 516. The motion must be denied "where there is *any* evidence or legitimate inference therefrom tending to support at least one of the allegations. Where the evidence is such that the minds of reasonable men *might* differ, a directed verdict is improper, and the resolution of conflictive evidence is for the jury." (Original emphasis). *Vernon Fire & Casualty Ins. Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173, 179. With this standard in mind, we examine the sufficiency of the evidence in support, first, of the existence of a defective condition unreasonably dangerous, and second, of the element of proximate cause.

a.

The theory of strict liability defined in the RESTATEMENT (SECOND) OF TORTS § 402A[1] has been expressly adopted as the law in Indiana. *Ayr-Way Stores, Inc. v. Chitwood* (1973), 261 Ind. 86, 300 N.E.2d 335; *Perfection Paint & Color Co. v. Konduris* (1970), 147 Ind.App. 106, 268 N.E.2d 681; *Cornette v. Searjeant Metal Products, Inc.* (1970), 147 Ind.App. 46, 258 N.E.2d 652. A *prima facie* case is established by evidence of "(1) a purchase of (2) a defective product from (3) a seller engaged in the business of selling such a product (4) and the product reached him without substantial change in its condi-

---

1. Section 402A states:

   Special Liability of Seller of Product for Physical Harm to User or Consumer

   (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

   (a)  the seller is engaged in the business of selling such a product, and

   (b)  it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

   (2)  The rule stated in Subsection (1) applies although

   (a)  the seller has exercised all possible care in the preparation and sale of his product, and

   (b)  the user or consumer has not bought the product from or entered into any contractual relation with the seller.

tion and (5) that the product caused physical harm because of the defect." *Ayr-Way Stores, Inc. v. Chitwood, supra,* at 340. The term "defective" requires some elaboration in this case. Chapman does not contend that there was any fault in the design and manufacture of Ortho-Novum, but rather claims that the lack of adequate warnings rendered it unreasonably dangerous.[2]

Section 402A, Comment *k* is particularly relevant in this case. It has been interpreted as creating an exception to the general rule of § 402A in the case of unavoidably unsafe products. *Basko v. Sterling Drug, Inc.* (2d Cir. 1969), 416 F.2d 417, 425. Chapman argues that Comment *k* refers only to products for which there is "dire need and no safe alternative." We disagree. As the text of Comment *k* indicates, the question is whether marketing of the product is justified in light of the known risks. This involves balancing the public interest in the availability of such a product against the attendant risks. There is no dispute that oral contraceptives are potentially dangerous. For this reason they are "ethical drugs" available only by prescription.[3] Nevertheless the public benefits from such a convenient and highly effective contraceptive. Therefore we have no difficulty in finding that oral contraceptives come under the protection of Comment *k*. *See Carmichael v. Reitz* (1971), 17 Cal.App.3d 1958, 95 Cal.Rptr. 381, 398-40; *Hamilton v. Hardy, infra,* at 1107; *Lawson v. G. D. Searle & Co.* (1976), 64 Ill.2d 543, 356 N.E.2d 779, 782-83; *Vaughn v. G. D. Searle & Co., supra,*

---

2. *See* Wade, *Strict Tort Liability of Manufacturers,* 19 S.W.L.J. 5, 14-15 (1965):

  The more difficult problem arises with a product which was made in the way it was intended to be made and in the condition planned and which yet proves to be dangerous. Is such an article defective? * * * In cases of this general type the phrase "defective condition" has no independent meaning, and the attempt to use it is apt to prove misleading. The only real problem is whether the product is "unreasonably dangerous," because "defective condition," if it is to be applied at all, depends on that.

Other commentators have suggested that the lack of adequate warning is what renders the product "defective." See 2 L. FRUMER & M. FRIEDMAN, PRODUCTS LIABILITY § 16A[4][e] (1967).

3. There are three reasons for which a drug may be deemed "ethical," or available only by prescription: it may be habit-forming; it may be unsafe for use except under a doctor's supervision due to its toxic quality, its potential for harmful effect, or method of use; and its availability may be limited by the terms of Federal Drug Administration approval. 21 U.S.C. § 353(b)(1) (1970).

at 1248; Leibowitz v. Ortho Pharmaceutical Corp., *supra*, at 457. *See also* Merrill, *Compensation for Prescription Drug Injuries*, 59 VA. L.R. 1, 7 (1973). Comment *k* emphasizes, however, that strict liability is avoided only when the product is accompanied by proper warnings:

> k. *Unavoidably unsafe products*. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are *especially common in the field of drugs.* * * * *Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous*. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. (Emphasis added).

The rationale of this comment was explained in *Borel v. Fibreboard Paper Products Corp.* (5th Cir. 1973), 493 F.2d 1076, 1088-89;

> Strict liability may not always be appropriate in such cases because of the important benefits derived from the use of the product. This is especially so with respect to new drugs that are essential in treating disease but involve a high degree of risk. It may also be so with respect to other commercial products possessing both unparalleled utility and unquestioned danger. As a practical matter, the decision to market such a product requires a balancing of the product's utility against its known or foreseeable danger. But, as comment k makes clear, even when such balancing leads to the conclusion that marketing is justified, the seller has a responsibility to inform the user or consumer of the risk of harm. The failure to give adequate warnings in these circumstances renders the product unreasonably dangerous. The rationale for this rule is that the user or consumer is entitled to make his own choice as to whether the product's utility or benefits justify exposing himself to the risk of harm. Thus, a true choice situation arises, and a duty to warn attaches, whenever a reasonable man would want to be informed of the risk in order to decide whether to expose himself to it. (Citations omitted).

*See also Incollingo v. Ewing* (1971), 444 Pa. 263, 282 A.2d 206. Thus, proof in this case of a defective condition unreasonably dangerous depends on the absence of proper warnings.[4]

---

4.  *See Lawson v. G. D. Searle & Co.* (1976), 64 Ill.2d 543, 356 N.E.2d 779, at 783.

In determining what is meant by "proper warnings," Comment *k* must be read together with Comment *j*.[5] Comment *j* appears to impose an important limitation on liability under § 402A where warnings are in issue, by conditioning a seller's duty to warn on actual or constructive knowledge of the danger. The authorities are split in this respect. Those holding that knowledge is required include *Midgley v. S.S. Kresge Co.* (1976), 55 Cal.App.3d 67, 127 Cal.Rptr. 217; *Christofferson v. Kaiser Foundation Hospital* (1971), 15 Cal.App.3d 75, 92 Cal.Rptr. 828; *Oakes v. Geigy Agricultural Chemicals & Co.* (1969), 272 Cal.App.2d 645, 77 Cal.Rptr. 709; *Tomer v. American Home Products* (Conn. 1976), 368 A.2d 35; *Woodill v. Parke, Davis & Co.* (1978), 58 Ill.App.3d 349, 374 N.E.2d 683; *Cunningham v. Charles Pfizer & Co.* (Okla. 1975), 532 P.2d 1377; *Bristol-Meyers Co. v. Gonzales* (Tex. 1978), 561 S.W.2d 801; *Crocker v. Winthrop Laboratories* (Tex. 1974), 514 S.W.2d 429; and *Ethicon, Inc. v. Parten* (Tex. Civ.App. 1975), 520 S.W.2d 527. Those indicating that the law should assume knowledge include *Hamilton v. Hardy* (Colo.App. 1976), 549 P.2d 1099 (the parties stipulated that knowledge be limited to that

---

5.  Comment *j* provides:

  j.  *Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he had knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.

  But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, is generally known and recognized. Again, the dangers of alcoholic beverages are an example, as are also those of foods containing such substances as saturated fats, which may over a period of time have a deleterious effect upon the human heart.

  Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

*See Davis v. Wyeth Laboratories, Inc., supra,* and *O'Hare v. Merck & Co.* (8th Cir. 1967), 381 F.2d 286, 291.

at the time the product was being used; the court applied the *Kimwood* test of defectiveness based on assumed knowledge); *Johnson v. Clark Equipment Co.* (Or. 1976), 547 P.2d 132; *Phillips v. Kimwood Machine Co.* (Or. 1974), 525 P.2d 1033; and *Little v. PPG Industries, Inc.* (Wash.App. 1978), 579 P.2d 940. *See also* Wade, *On the Nature of Strict Tort Liability for Products*, 44 MISS. L.J. 825, 834-35 (1973). In the *Little* case, the court dismissed Comment *j* as "incongruous, since it shifts the emphasis away from the condition of the product (strict liability) and back to the reasonableness of the manufacturer's conduct (negligence)." 579 P.2d at 946. We reserve judgment on the broad issue, and confine ourselves to the question of whether knowledge is required where *prescription drugs* are concerned.

Comment *k* is replete with language indicating that the adequacy of a warning depends in part on what was known. In addition to the reference to "the present state of human knowledge," in the portion already quoted, Comment *k* states

> It is also true in particular of many new or experimental drugs as to which, because of *lack of time and opportunity for sufficient medical experience,* there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a *medically recognizable risk.* The seller of such products, against with the qualification that they are properly prepared and marketed, *and proper warning is given, where the situation calls for it,* is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a *known* but apparently reasonable risk. (Emphasis added).

As stated in 3 L. FRUMER & M. FRIEDMAN, PRODUCTS LIABILITY § 33.02[4],

> [T]he Restatement has carved out an exception for drugs and vaccines . . . . Furthermore, before there can be liability predicated on the latter basis [not accompanied by appropriate warnings], Comment *k* requires that the manufacturer have knowledge of the danger, otherwise why recognize the factors of "lack of time and opportunity for sufficient medical experience."

The knowledge language of Comment *j* appears in the context of ingre-

dients to which consumers are allergic. The comment then states "Likewise in the case of *poisonous drugs, or those unduly dangerous for other reasons*, warning as to use may be required." (emphasis added). Similar language appears in Comment *h*, which states that when a seller "has reason to anticipate that danger may result from a particular use, as where a drug is sold which is safe only in limited doses, he may be required to give adequate warning of the danger . . . ." The language in these comments reinforces the sense of an exception to strict liability in the case of prescription drugs. The justification for such an exception is suggested by Dean Prosser:

> The argument that industries producing potentially dangerous products should make good the harm, distribute it by liability insurance, and add the cost to the price of the product, encounters reason for pause, when we consider that two of the greatest medical boons to the human race, penicillin and cortisone, both have their dangerous side effects, and that drug companies might well have been deterred from producing and selling them. Thus far the courts have tended to hold the manufacturer to a high standard of care in preparing and testing drugs of unknown potentiality and in giving warning; but in the absence that this standard has not been met, they have refused to hold the maker liable for the *unforeseeable harm.* (Emphasis added).

W. PROSSER, TORTS § 99, at 661 (4th ed. 1971). Further explanation is offered in *Oakes v. Geigy Agricultural Chemicals, supra,* at 713, not a prescription drug case but nevertheless of interest:

> The rationale of the strict liability rule is that the injured person is helpless to protect himself from the *actually defective* product. It is only reasonable therefore that as between the injured user and the one who places the product on the market the latter should bear the loss. The same rationale would apply to the marketing of a product which contains an ingredient which the manufacturer knows or should know "by the application of reasonable, developed human skill and foresight" is dangerous. But, in the view of this court, that is where the reason for the rule ceases and the rule of "strict" liability itself should stop. To exact an obligation to warn the user of unknown and unknowable allergies, sensitivities and idiosyncrasies would be for the courts to recast the manufacturer in the role of an insurer beyond any reasonable application of the rationale expressed above. (Citations omitted) (original emphasis).

We are persuaded that the duty to warn under Comment *k* does not

arise until the manufacturer knows or should know of the risk. *See also Basko v. Sterling Drug, Inc., supra,* at 426; *Davis v. Wyeth Laboratories, Inc.* (9th Cir. 1968), 399 F.2d 121, 129. In the case of drug manufacturers, the standard of constructive knowledge is that of an expert in that particular field. *Reyes v. Wyeth Laboratories, Inc.* (5th Cir. 1974), 498 F.2d 1264; *McEwen v. Ortho Pharmaceutical Corp.* (1974), 99 Or. Adv. Sh. 2357, 528 P.2d 522, 528. *See Schenebeck v. Sterling Drug, Inc.* (8th Cir. 1970), 423 F.2d 919, 922. As indicated in *Basko*, dates are "vitally important" with respect to the duty to warn. Because a manufacturer cannot be required to warn of a risk unknown to science, the knowledge chargeable to him must be limited to that of the period during which the plaintiff was using the product in question. 416 F.2d at 426; *McEwen v. Ortho Pharmaceutical Corp., supra,* at 530.

A second important limitation on liability in this context, not mentioned in the comments, applies to manufacturers of ethical drugs. Since such drugs are available only by prescription, a manufacturer's duty to warn extends only to the medical profession, and not the ultimate users.[6] *See Reyes v. Wyeth Laboratories, supra; Hoffman v. Sterling Drug, Inc.* (3rd Cir. 1973), 485 F.2d 132; *Basko v. Sterling Drug, Inc., supra; Davis v. Wyeth Laboratories, Inc., supra; Sterling Drug, Inc. v. Cornish* (8th Cir. 1966), 370 F.2d 82; *Stottlemire v. Cawood* (D.C. D.C. 1963), 213 F. Supp. 897; *Love v. Wolf* (1964), 226 Cal.App.2d 378, 38 Cal.Rptr. 183; *Magee v. Wyeth Laboratories* (1963), 214 Cal.App.2d 340, 29 Cal.Rptr. 322; *Hamilton v. Hardy* (Colo.App. 1976), 549 P.2d 1099; *Smith v. E. R. Squibb & Sons, Inc.* (1976), 69 Mich.App. 375, 245 N.W.2d 52; *Mulder v. Parke Davis & Co.* (1970), 288 Minn. 332, 181 N.W.2d 882; *Johnston v. Upjohn Co.* (Mo. App. 1969), 442 S.W.2d 93; *Hines v. St. Joseph's Hosp.* (1974), 86 N.M. 763, 527 P.2d 1075; *Parker v. State* (1951), 201 Misc. 416, 105 N.Y.S.2d 735; *Vaughn v. G. D. Searle & Co.* (Or. 1975), 536 P.2d 1247; *McEwen v. Ortho Pharmaceutical Corp., supra; Leibowitz*

---

6.   There is some argument against applying this rule with respect to drugs such as oral contraceptives, *see* Comment, *Liability of Birth Control Pill Manufactu··ers,* 23 HASTINGS L.J. 1526 (1972), which is effectively answered in *Terhune v. A.H. Robins Co.* (1978), 90 Wash.2d 9, 577 P.2d 975, 978.

We note that after the appellee ceased taking Ortho-Novum, the Federal Drug Administration issued a regulation requiring that warnings be directed to patients in the case of oral contraceptives. *See* 21 C.F.R. 310.501(a) (April 1, 1977). However, we will not impose this expansion of duty retrospectively.

*v. Ortho Pharmaceutical Corp.* (1973), 224 Pa. Super. 418, 307 A.2d 449; *Gravis v. Parke Davis & Co.* (Tex. Civ. App. 1973), 502 S.W.2d 863; *Terhune v. A. H. Robins Co.* (1978), 90 Wash.2d 9, 577 P.2d 975. The rationale for this exception to the Restatement's general rule is that

> Prescription drugs are likely to be complex medicines, estoeric in formula and varied in effect. As a medical expert, the prescribing physican can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative.

*Reyes v. Wyeth Laboratories, Inc., supra.* The court in *Terhune v. A. H. Robins Co., supra,* elaborates further:

> The reasons for this rule should be obvious. Where a product is available only on prescription or through the services of a physician, the physician acts as a "learned intermediary" between the manufacturer or seller and the patient. It is his duty to inform himself of the qualities and characteristics of those products which he prescribes for or administers to or uses on his patients, and to exercise an independent judgment, taking into account his knowledge of the patient as well as the product. The patient is expected to and, it can be presumed, does place primary reliance upon that judgment. The physician decides what facts should be told to the patient. Thus, if the product is properly labeled and carries the necessary instructions and warnings to fully apprise the physician of the proper procedures for use and the dangers involved, the manufacturer may reasonably assume that the physician will exercise the informed judgment thereby gained in conjunction with his own independent learning, in the best interest of the patient. It has also been suggested that the rule is made necessary by the fact that it is ordinarily difficult for the manufacturer to communicate directly with the consumer. (Footnote omitted).

In summary, a proper warning under Comment *k* in the context of the facts at bar, communicates a risk attendant on the use of the product which is known to experts in the field during the period in which the product is used. It need only be directed to doctors, not patients who are the ultimate users.

An absence of proper warning which may render a product unreasonably dangerous can range from a complete absence of any warn-

ing to a warning which is given but is inadequate. *See Basko v. Sterling Drug, Inc., supra,* at 426. In connection with the latter range, the test of propriety has been expressed as whether the warnings given are "reasonable under the circumstances." *Sterling Drug, Inc. v. Yarrow* (8th Cir. 1969), 408 F.2d 978, 993. *Sterling Drug, Inc. v. Cornish, supra.* In arriving at this conclusion, the court in *Yarrow* compared § 402A with § 388 of the Restatement.[7] Section 388 in essence restates the common law cause of action for failure to exercise reasonable care to inform users of the dangerous qualities of a chattel. *Compare* Section 388, *with Ft. Wayne Drug Co. v. Flemion* (1931), 93 Ind.App. 40, 175 N.E. 670, 672. The court in *Yarrow* found that classifying a breach of duty to warn under either § 388 or § 402A was unimportant because the standard under either is the same: the effort to warn must be reasonable under the circumstances.

The peculiar nature of an action based on absence of proper warning under § 402A has resulted in further comparisons with negligent breach of duty to warn. It has been stated that the fundamental difference between strict liability and negligence is the requirement of actual or constructive knowledge of the defect on the part of the seller. *See* Wade, *On the Nature of Strict Tort Liability for Products,* 44 MISS. L.J. 825, 834-35 (1973); and Keeton, *Product Liability and the Meaning of Defect,* 5 ST. MARY'S L.J. 30, 37-38 (1973). Thus, those authorities finding

---

7.   Section 388 states:

Chattel Known to be Dangerous for Intended Use
  One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

  (a)   knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

  (b)   has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

  (c)   fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

This section has recently been adopted as the law of Indiana, in *Stapinski v. Walsh Construction Co.* (1978), 178 Ind.App. 623.

knowledge necessary in connection with the duty to warn under § 402A have frequently noted that there is no practical difference between the two theories in this context. In *Basko v. Sterling Drug, Inc., supra,* at 426, the court found that the exception created by Comment *k* in the case of unavoidably unsafe products "simply adopts the ordinary negligence concept of duty to warn." In *Midgley v. S.S. Kresge Co., supra,* at 221, the court stated that "As we recognized in *Oakes* . . . the prerequisite of actual or constructive knowledge of product dangers as a limitation upon duty to warn thereof engrafts concepts substantive negligence law onto the element of defect in cases of strict liability for failure to warn." In Merrill, *Compensation for Prescription Drug Injuries, supra,* at 31, it is stated that negligence and strict liability are "functionally interchangeable in most drug cases." It has been held erroneous to instruct a jury on both theories. *Rainbow v. Albert Elia Building Co.* (1975), 49 A.D.2d 250, 373 N.Y.S.2d 928; *Skaggs v. Clairol, Inc.* (1970), 6 Cal.App.3d 1, 85 Cal. Rptr. 584. In *Anderson v. Klix Chemical* (1970), 256 Or. 199, 472 P.2d 806, the Supreme Court of Oregon concluded there was no difference between strict liability and negligence where liability is based on the absence of proper warnings. Soon thereafter, the same court expressly overruled *Anderson* on that issue. In *Phillips v. Kimwood Machine Co., supra,* the court found certain differences:

> In a strict liability case we are talking about the condition (dangerousness) of an article which is sold without any warning, while in negligence we are talking about the reasonableness of the manufacturer's action in selling the article without a warning. The article can have a degree of dangerousness because of a lack of warning which the law of strict liability will not tolerate even though the actions of the seller were entirely reasonable in selling the article without a warning considering what he knew or should have known at the time he sold it.

> A way to determine the dangerousness of the article, as distinguished from the seller's culpability, is to assume the seller knew of the product's propensity to injure as it did, and then to ask whether, with such knowledge, he would have been negligent in selling it without a warning.

525 P.2d at 1039. The court acknowledged that the language and concepts of reasonablenss used to determine unreasonable risk under § 402A are the same as those in negligence cases, and that "the same process

is going on in each instance, *i.e.*, weighing the utility of the article against the risk of its use." *Id.* The distinction lay in "the manner in which the decisional functions are distributed between the court and the jury." 525 P.2d at 1039. The *Phillips* court quoted extensively from Wade, *Strict Tort Liability of Manufacturers*, 19 S.W.L.J. 5 (1965) in which Professor Wade elaborates the point that in some kinds of cases under § 402A, where social policy issues are particularly important, court's control of jury action is more extensive than in ordinary negligence cases. The court in *Phillips* noted that the considerations enumerated therein were for the use of a court in determining whether a plaintiff's case warrants submission to a jury: "If such a case has been made out, then it is submitted to the jury for its determination under instructions as to what constitutes a 'dangerously defective' product, much in the same manner as negligence is submitted to the jury under the 'reasonable man' rule." 525 P.2d at 1040. In *Johnson v. Clark Equipment Co., supra*, at 142 n. 12, the *Kimwood* case is interpreted as stating that strict liability "assumes that the particular danger presented was foreseeable by the manufacturer." It thus appears that the difference discovered in *Kimwood* is that actual or constructive knowledge need not be proved. Otherwise, the tests of culpability and dangerousness are identical.

This question has also arisen with respect to breach of implied warranty. Numerous courts have found no practical difference between the theories of strict liability under § 402A and breach of implied warranty where the absence of proper warning is in issue. *See Davis v. Wyeth Laboratories, Inc., supra*, at 126; *Basko v Sterling Drug, Inc., supra*, at 427, and the cases cited therein. *See also, Withers v. Sterling Drug, Inc.* (1970), 319 F.Supp. 878, 883 (seeks same remedy under a different label); *Fruehauf Trailer Div. v. Thornton* (1977), 174 Ind.App. 1, 366 N.E.2d 21, 28 (same evidence supports either action); and *Gregory v. White Truck & Equipment Co.* (1975), 163 Ind.App. 240, 323 N.E.2d 280, 289.

In *Smith v. E. R. Squibb & Sons, supra* the court upheld a trial court's refusal to submit a case based on absence of proper warning to the jury on the theory of breach of implied warranty in addition to negligence:

> We do not imply that there is not a valid distinction, in a products liability case, between the theory of implied warranty and the theory of negligence. Under the particular facts of this failure to

warn case, however, it becomes a distinction without a difference since the standard and the proofs necessary to recover are identical under both theories. We find it far less confusing to discuss the duty to warn in terms of reasonableness right from the start rather than to become involved in the more cumbersome warranty concepts. As the California Court of Appeals said in *Love v. Wolf*:

> "No rule of *strict* liability (whether expressed in terms of breach of implied warranty, or in terms of a breach of a duty of care in tort) has been applied to a failure adequately to warn of the dangers inherent in the use of a drug. * * * We have already held here there is a duty to exercise reasonable care to warn against the known dangers of a product. * * * There would appear, however, to be no sound basis to attempt to restate these rules in the terms of the law of contract warranties nor to extend them to impose a greater degree of care than that already stated." *Love v. Wolf, supra*, 226 Cal.App.2d at pp. 402-403, 38 Cal.Rptr. at pp. 197-198.

We find, therefore, that the trial court did not commit reversible error in submitting the case to the jury on the negligence theory alone.

245 N.W.2d at 56-57.

In Indiana, negligent breach of the duty to warn has been ██ ██ described as follows:

[T]he common law as applied to a vendor who sold dangerous merchandise is well stated in Wellington v. Downer Oil Co., 104 Mass. 64, as follows:   "It is well settled that a man who delivers an article, which he knows to be dangerous or noxious, to another person, without notice of its nature and qualities, is liable for any injury which may reasonably be contemplated as likely to result, and which does in fact result, therefrom, to that person or any other, who is not himself in fault.

*Fort Wayne Drug Co. v Flemion, supra*, at 672. Except for the mention of the contributory negligence defense, this language effectively describes the cause of action under § 402A with the attendant limitation of knowledge imposed where prescription drugs are concerned. Nevertheless, we agree with the above-cited authority that there *is* a difference between negligent breach of duty to warn and breach of warranty or strict liability based on the absence of proper warnings. If nothing more, § 402A requires one conclusion of law in addition to a

finding of negligence: the manufacturer being negligent in endeavoring to warn of a risk, the product is in a "defective condition unreasonably dangerous." This conclusion requires no additional finding of fact by the jury, therefore we agreee that in some cases it may be unnecessary to give instructions on all three theories. A fundamental premise of the jury system is that a jury will understand a court's instructions. However, there is no harm in simplifying matters where the differences between these three theories are of no benefit to the plaintiff, and might result in unnecessary confusion.[8]

In light of these similarities, the court in *Sterling Drug, Inc. v. Yarrow, supra*, employed negligence concepts in analyzing reasonableness of warnings. Following the guidelines of § 388, Comment *n*, the court held that what is reasonable is proportionate to the gravity of the risk involved. 408 F.2d at 994. Thus, the trier of fact in that case could reasonably find the harm risked so great that any warning less than the "best" or "most effective" is not reasonable under the circumstances. *Spruill v. Boyle-Midway, Inc.* (4th Cir. 1962), 308 F.2d 79, a negligence case based on the failure to adequately warn of the poisonous character of the defendant's furniture polish, provides a detailed definition of an adequate warning:

> If warning of the danger is given and this warning is of a character reasonably calculated to bring home to the reasonably prudent person the nature and extent of the danger, it is sufficient to shift the risk of harm from the manufacturer to the user. To be of such character the warning must embody two characteristics: first, it must be in such form that it could reasonably be expected to catch the attention of the reasonably prudent man in the circumstances of its use; secondly, the content of the warning must be of such a nature as to be comprehensible to the average user and to convey a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person.

---

8. The issue of defenses in particular may require that instructions be limited to one theory. For instance, a jury's finding of no liability in negligence by reason of the plaintiff's contributory negligence is only of theoretical interest where strict liability under § 402A has been alleged as well. Liability for the latter could be based on the same findings of fact as nonliability for the former, since contributory negligence is not a defense to strict liability under § 402A. *Perfection Paint & Color Co. v. Konduris* (1970), 147 Ind.App. 106, 258 N.E.2d 681, 689. Thus there may be no need to instruct the jury with respect to the negligence count.

308 F.2d at 85. A similar definition appears in *Muncy v. Magnolia Chemical Co.* (Tex. Civ. App. 1968), 437 S.W.2d 15:

(1)  [I]t must be in such *form* that it could reasonably be expected to catch the attention of the reasonably prudent man in the circumstances of its use;

(2)  the *content* of the warning must be of such a nature as to be comprehensible to the average user and to convey a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person.... the question of whether or not a given warning is legally sufficient depends upon the language used and the impression that such language is calculated to make upon the mind of the average user of the product.

Implicit in the duty to warn is the duty to warn with a degree of *intensity* that would cause a reasonable man to exercise . . . the caution commensurate with the potential danger. . . . A clear cautionary statement setting forth the exact nature of the dangers involved would be necessary to fully protect the seller. . . . (Emphasis added).

Thus, a warning may be inadequate in factual content, inadequate in the expression of the facts, or inadequate in the method by which it is conveyed. *See McEwen v. Ortho Pharmaceutical Corp., supra,* at 529.

To summarize, a product which is faultlessly designed and manufactured may be nevertheless unreasonably dangerous within the meaning of § 402A if not accompanied by proper warnings. A manufacturer can only be required to warn of risks known during the time in which the plaintiff was using the product in question, however he is charged with the knowledge of an expert in that field. In the case of ethical drugs, the manufacturer's duty is discharged if adequate warning is given to doctors, who act as "learned intermediaries" between the manufacturer and the ultimate user. To be adequate, a warning must be reasonable under the circumstances. As a practical matter, this is determined by application of negligence theory.

As proof of the inadequacy of Ortho's warnings, Chapman offered into evidence the full text of the written warnings in question[9] and

---

9.  The June, 1968 package insert and the 1969 Physicians' Desk Reference contained the following language, which conformed to the Federal Food and Drug Administra-

expert testimony as to the state of knowledge in the medical profession at the time. Ortho argues that the plaintiff's expert was not qualified to give an expert opinion as to the adequacy of the warnings since he had no special training or experience in reading and writing warnings. This is not the test:

The true rule appears to be fairly stated in the case of Isenhour

---

tion's requirement for uniform labeling of package inserts for oral contraceptives:
"WARNINGS

1.  The physician should be alert to the earliest manifestations of thrombotic disorders (thrombophlebitis, cerebrovascular disorders, pulmonary embolism, and retinal thrombosis). Should any of these occur or be suspected, the drug should be discontinued immediately.

    Studies conducted in Great Britain and reported in April 1968 estimate there is a seven to tenfold increase in mortality and morbidity due to thromboembolic diseases in women taking oral contraceptives. In these controlled retrospective studies, involving 36 reported deaths and 58 hospitalizations due to 'idiopathic' thromoembolism, statistical evaluation indicates that the differences observed between users and non-users were highly significant.

    The conclusions reached in the studies are summarized in the table below:

Comparison of Mortality and Hospitalization Rates
Due to Thromboembolic Disease in Users and Non-Users
of Oral Contraceptives in Britain

| Category | | | Hospitalization Rates Morbidity |
|---|---|---|---|
| | Age 20-34 | Age 35-44 | Age 20-44 |
| Users of Oral Contraceptives | 1.5/100,000 | 3.9/100,000 | 47/100,000 |
| Non-Users | 0.2/100,000 | 0.5/100,000 | 5/100,000 |

No comparable studies are yet available in the United States. The British data, especially as they indicate the magnitude of the increased risk to the individual patient, cannot be directly applied to women in other countries in which the incidences of spontaneously occurring thromboembolic disease may be different.

\* \* \*

ADVERSE REACTIONS OBSERVED IN
PATIENTS RECEIVING ORAL CONTRACEPTIVES

A statistically significant association has been demonstrated between use of oral contraceptives and the following serious adverse reactions:

Thrombophlebitis
Pulmonary embolism."

v. State, 1901, 157 Ind. 517, 528, 62 N.E. 40, 44, 87 Am. St. Rep. 228, in which this court said: "Courts have never undertaken to set up a standard of scientific knowledge by which the competency of a witness may be determined, and have not gone to the extent of holding that a scientific witness can only testify from facts learned by him from personal demonstration. The general rule in such cases, in this state, at least, seems to be that, where a witness exhibits such a degree of knowledge, gained from experiments, observation, standard books, or other reliable source, as to make it appear that his opinion is of some value, he is entitled to testify leaving to the trial court, in the exercise of a sound discretion, the right to say when such knowledge is shown, and to the jury the right to say what the opinion is worth; and, as in all other cases of discretion, this court will review the action of the trial court only when that discretion clearly appears to have been abused."

*Illinois Steel Co. v. Fuller* (1939), 216 Ind. 180, 23 N.E.2d 259, 263. Our review of this expert's qualifications convinces us that clearly there was no abuse of discretion in permitting his testimony. Regarding the state of knowledge in the medical profession at the time, the expert testified that "statistics were being published to show the direct relationship of the oral contraceptive pill to an increased disposition in women to develop blood clotting. . . ." The expert then summarized several reports of studies. He was asked, "Was there information in the year 1968 available to the defendant here from these studies, you take the Wright Committee, the British Studies, the Hellman Reports, that did establish a relationship between the use of the pill and thrombophlebitis?" The expert responded "yes " The expert was then requested to read aloud the following portion of Ortho's 1968 Physicians Desk Reference entry for Ortho-Novum: "No comparable studies are yet available in the United States. The British data, *especially as they indicate the magnitude of the increased risks* to the individual patient, *cannot be directly applied to women in other countries* in which the incidences of spontaneously occurring thromboembolic disease may be different." (Emphasis added). The expert was asked to state his opinion of the adequacy of the warning. After objections, preliminary questions, a recess, and more objections, he stated that in his opinion the warnings were "insufficient, incomplete and misleading." The record further discloses that Ortho employed detail men as a method of communicating with Chapman's doctor, however, Chapman's doctor testified that they did no more than

leave drug samples and more literature. Ortho in turn offered expert opinion that a causal relationship had not been established between oral contraceptives and thrombophlebitis, and argues that there should be no liability for the failure to state what is not proved true.[10] This question of a relationship was properly for the trier of fact to determine. A number of courts have found defendant-manufacturers to be entitled to directed verdicts on the ground that the warnings in question were adequate as a matter of law. *See, e.g., Dunkin v. Syntex Laboratories* (W.D. Tenn. 1977), 443 F.Supp. 121; *Chambers v. G. D. Searle & Co.* (D. Md. 1975), 441 F. Supp. 377. We decline Ortho's invitation to follow their example in the case presently before us, notwithstanding the precedent of *Carmen v. Eli Lilly & Co.* (1941), 109 Ind.App. 76, 32 N.E.2d 729. In *Carmen* the evidence was without conflict that the warning in question accurately reflected the state of knowledge in the field of medicine regarding the drug in question, and that the plaintiff's doctor had read and understood the warnings. The only expert medical testimony offered with respect to adequacy clearly favored the defendant, thus *Carmen* is distinguishable from the case at bar. At the very least our research has disclosed that reasonable minds could and have differed with respect to the very language presenlty at issue, *Compare Liebowitz v. Ortho Pharmaceutical Corp., supra,* specifically approving this language, with *McEwen v. Ortho Pharmaceutical Corp., supra,* characterizing it as "questionable." Clearly we cannot find as a matter of law that the warnings were adequate, nor does Ortho's compliance with federal law require a different result. *Gilbert v. Stone City Const. Co.* (1976), 171 Ind.App. 418, 357 N.E.2d 738, 745. *See also McEwen v. Ortho Pharmaceutical Corp., supra,* at 533-34, and the authority cited therein.

In summary, we find that Chapman offered sufficient evidence on the basis of which the jury could reasonably find Ortho's warning inadequate, if not, in a *technical* sense, with regard to factual content, then

---

10. With respect to this argument we note the following language from *Hamilton v. Hardy, supra,* at 1108, citing *McCue v. Norwich Pharmacal Co., supra,* as authority: "In this connection, we would also point out that under a strict liability theory, a manufacturer must warn of dangers and risks, whether or not a causal relationship between use of the product and the various injuries has been *definitely* established at the time of the warning." (Emphasis added).

at least with regard to communicating a clear indication of the risk. This satisfies the element of proof, required of Chapman under § 402A, of a "defective condition unreasonably dangerous." Ortho was properly refused a directed verdict on the basis of this element.

b.

Proximate cause is commonly defined as "that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred." *Johnson v. Bender* (1977), 174 Ind.App. 638, 369 N.E.2d 936, 939. This latter language describes what is known as the "but-for" test. A fundamental element of proximate cause is that the injury or consequence of the wrongful act be of a class reasonably foreseeable at the time of that act. *Elder v. Fisher* (1966), 247 Ind. 598, 217 N.E.2d 847; *Meadowlark Farms, Inc. v. Warken, supra.* The defendant's act need not be the sole proximate cause; many causes may influence a result. *Meadowlark Farms, Inc. v. Warken, supra,* at 129. The question is whether "the original wrong was one of the proximate rather than remote causes." *Dreibelbis v. Bennett* (1974), 162 Ind.App. 414, 319 N.E.2d 634, 638. Thus, "the ultimate test of legal proximate causation is the reasonable foreseeability. The assertion of an intervening, superceding cause fails to alter this test." *Id.* Rather,

> Where harmful consequences are brought about by intervening independent forces the operation of which might have been reasonably foreseen, then the chain of causation extending from the original wrongful act to the injury is not broken by the intervening and independent forces and the original wrongful act is treated as a proximate cause.

*New York Central R. Co. v. Cavinder* (1965), 141 Ind.App. 42, 211 N.E.2d 502, 508. Proximate cause is generally a question for the trier of fact.

A simple "but-for" test of proximate cause is inadequate in the present case for several reasons. First, Ortho-Novum is available only by prescription. Thus the independent actions of a doctor are necessarily a part of causation in fact. Second, an adequate warning with respect to unavoidably unsafe products would not in any way reduce or avoid the risk of harm involved. It would only serve to inform the person to

whom the duty to warn extends, in this case the doctor, so that he may choose whether the risk should be incurred at all, or cease use of the product if the risk materializes.[11] Finally, Comment *j* provides a presumption that an adequate warning would be heeded. This operates to the benefits of a manufacturer where adequate warnings in fact are given. Where warnings are inadequate, however, the presumption is in essence a presumption of causation.[12]

In *McEwen v. Ortho Pharmaceutical Corp., supra*, at 538, a case very similar to the case at bar, the problem of causation was analyzed as comprised of two steps. The first question is whether the defendant's failure to adequately warn was a substantial cause of the plaintiff's ingestion of the defendant's oral contraceptive. The second question is whether such ingestion was a substantial cause of the injury suffered. To this we would add that Comment *j* provides a presumption in the affirmative in response to the first question, which the defendant may rebut.

Ortho has argued four circumstances which preclude a finding that any inadequacy of the warnings was the proximate cause of Chapman's injury. These are, first, that the prescribing doctor had actual knowledge of the risk derived from other sources, second, that the doctor did not rely on Ortho's warnings, third, that Chapman used the drug beyond her prescription, and fourth, that Chapman failed to report preliminary symptoms. The first two are essentially the same: the warnings could not have been a substantial cause of the plaintiff's injury if the decision to prescribe was not in any way influenced by the representations therein. Thus, Ortho argues that the evidence shows, as a matter of

---

11. *See Hamilton v. Hardy, supra*, at 1110: "The warning thus achieves two purposes: (1) It will alert the doctor to premonitory symptoms of the side effect. *Reyes, supra; Vaughn v. G.D. Searle Co., supra*; and (2) it will enable the patient to evaluate the relative advantages and disadvantages of taking the drug. See *McEwen, supra*."

12. *See* Comment *j, supra*, and *Technical Chemical Co. v. Jacobs* (Tex. 1972), 480 S.W.2d 602, 606:

Such a presumption works in favor of the manufacturer when an adequate warning is present. Where there is no warning, as in this case, however, the presumption that the user would have read an adequate warning works in favor of the plaintiff user. In other words, the presumption is that Jacobs would have read an adequate warning. The presumption, may, however, be rebutted if the manufacturer comes forward with contrary evidence that the presumed fact did not exist.

law, that an adequate warning would *not* have been heeded in this case. Such an approach is not without precedent. *See Douglas v. Bussabarger* (Wash. 1968), 438 P.2d 829, and *Oppenheimer v. Sterling Drug, Inc.* (1964), 7 Ohio App.2d 103, 219 N.E.2d 54. We note, however, that in both cases the prescribing doctor testified that he relied on his own knowledge and experience, and did not read or rely on the defendant's warnings. There is no such evidence in the case at bar. Rather, Chapman's doctor testified that he relied on entries in the P.D.R. as a basis for prescribing drugs. He did not read package inserts as he assumed that they were no different from the P.D.R. entry. His testimony shows that he was "aware" of a study in Britain,[13] but not of the specifics, and that had he known, "it would have made a difference." Chapman's doctor testified that at the time he prescribed Ortho's oral contraceptive for Chapman, he believed that it was "completely safe" and that Ortho would have "made sure" he would find out if it were not so. Even if the present case had not been thus distinguishable from *Douglas* and *Oppenheimer*, we would not find an absence of proximate cause *as a matter of law*. The majority of cases have held that the intervening negligence of a doctor does not relieve the manufacturer of liability, provided that the manufacturer's wrongful act may have contributed to it. *See, e.g., McCue v. Norwich Pharmacal Co.* (1st Cir. 1972), 453 F.2d 1033, 1035 (open-ended renewal of prescription did not relieve manufacturer of liability for inadequate warning that possible side effect for long-term use was pulmonary fibrosis); *Sterling Drug, Inc. v. Yarrow, supra,* at 994 (doctor's failure to learn of risk from other sources doesn't relieve defendant of liability, and it is foreseeable that doctors do not read all of the literature mailed to them); *Sterling Drug, Inc. v. Cornish, supra,* at 85 (doctor's allegedly negligent failure to keep abreast of medical literature, including that of defendant's, does not relieve defendant of liability); *Stevens v. Parke, Davis & Co.* (1973), 107 Cal.Rptr. 45, 507 P.2d 653, 663 (doctor's neligent disregard of warnings given was not intervening cause, since induced by over-promotion of drug). *See also Schenebeck v. Sterling Drug, Inc., supra; Hamilton v. Hardy, supra; Krug v. Sterling Drug,*

---

13. According to the record, there were three studies in Great Britain during 1965 and 1966 to determine whether a cause-and-effect relationship existed between the use of oral contraceptives and thrombosis, thromboembolism, and other vascular diseases, published in Vessey & Doll, 2 BRITISH MEDICAL J. 199 (1968).

*Inc.* (Mo. S.Ct. 1967), 416 S.W.2d 143; *McEwen v. Ortho Pharmaceutical Corp., supra.* The concept of warning encompasses more than available printed material.[14] The avowed nonreliance present in *Douglas* and *Oppenheimer* could have resulted in part from a lack of insistence in endeavoring to attract attention to a warning or a lack of urgency in expressing the substance. In *Sterling Drug, Inc. v. Yarrow, supra,* this possibility is discussed in the context of reasonableness rather than proximate cause. Nevertheless, we feel the reasoning supports our conclusion here. In *Yarrow,* the defendants argued that they were entitled to reversal because the evidence showed reasonable effort to warn by means of a warning letter mailed to the doctor. The court responded to this argument that:

> The "Dear Doctor" letter could have been reasonably found to be lacking in emphasis, timeliness and attention inviting qualities. A reasoning mind could find that appellant's warning actions were unduly delayed, reluctant and lacking in a sense of urgency, and therefore unreasonable under the circumstances. While a warning in February 1963 in an attention inviting letter would probably have been timely in this case if promptly received and heeded by appellee's physician, *it could be inferred that a reasonably earlier warning, with greater intensity could well have reached appellee's physician directly, or indirectly through other professional channels such as conversations with other doctors and discussions at conventions.* The delay in issuance of the "Dear Doctor" letter from August 1962 to February 1963, its wording, and the manner of its circulation could be found unreasonable considering the magnitude of the risk involved. (Emphasis added).

408 F.2d at 994. Where a defendant fails to make reasonable efforts to attract attention to his warning or convey its urgency, a jury could reasonably find the failure to heed such a warning a natural and foreseeable result. The failure to heed a warning may be negligent, but we cannot say as a matter of law that no inadequacy of warning could have contributed to such negligence. Therefore the question of proximate cause should be left for the trier of fact to determine.

The second two contentions of Ortho concern the actions of the plain-

---

14. *See Merrill, Compensation for Prescription Drug Injuries, supra* at 23, for a thorough discussion of ineffective drug labelling.

tiff. Because Ortho's oral contraceptive is available only by prescription, Ortho's duty to warn is discharged if adequate warnings are given the prescribing and treating doctors. This clearly reflects the assumption that prescription drugs will only be used under some supervision of a doctor. Where a patient evades this supervision, warnings, whether adequate or inadequate, are useless to enable the patient to cease use of the drug if the risk materializes. Thus, in *Chambers v. G.D. Searle, supra,* wherein the plaintiff did not report her symptoms to her doctor, her doctor had no knowledge of her hypertension and no basis for relating the defendant's warning with respect to hypertension to her case. The court found no proximate cause, as an adequate warning would have made no difference on the doctor's actions. *See also, Vaughn v. G.D. Searle & Co., supra,* at 1249-50. In the present case there was evidence that prior to Chapman's manifestation of thrombophlebitis she had stumbled against a table thereby bruising her leg and causing her to suffer some swelling. Ortho contends that her failure to report this incident precluded a finding of proximate cause. However the evidence was conflicting as to whether the incident was in fact a symptom or indication of thrombophlebitis, therefore the question was properly presented to the jury for resolution.

By the same reasoning, use without or beyond a prescription could preclude a finding of proximate cause. Chapman's prescription was for one year. Her doctor's records indicated that he gave her the prescription on July 21, 1968. Chapman testified that she used the pill from November, 1968, to January, 1970, when her thrombophlebitic episode occurred. Thus it is not clearl how long over one year she continued to have the prescription filled, but it was certainly no longer than six months. Her expert testified that it made no difference whether she began use of the pill in July or November of 1968, with regard to causation. In *Oppenheimer v. Sterling Drug, Inc., supra,* the prescription in question was refilled for two and a half years, although it was supposed to be limited to six months. In addition, the plaintiff was out of touch with her physician for a period of a year and three months. The court affirmed the grant of a directed verdict on the ground that reasonable minds could only conclude that the doctor's nonreliance on the warnings, the druggist's unauthorized filling of the prescription and the plaintiff's own actions constituted the cause of her

injuries. Comparing the above decision with that in *McCue v. Norwich Pharmacal Co., supra,* concerning an open-ended prescription, we are persuaded that a directed verdict may not always be appropriate in the circumstances discussed above. The essential question is whether the inadequacy of the warnings was a substantial factor in bringing about the harm. It is not unreasonable to suggest that had the doctor been adequately warned he in turn would have impressed on the patient the importance of medical supervision. In the present case it could be supposed that Chapman might then have regarded with more suspicion that which could be viewed as a relatively trivial accident (assuming here that her bruise was indeed a symptom). It is possible that some inadequacy of warning thus contributed to the actions of either doctor or patient, and that those actions may have been reasonably foreseeable. We do not disagree that the actions of a doctor or his patient may be efficient intervening causes, but it is for the trier of fact to make such a determination in this case. *See New York Central R. Co. v. Cavinder, supra,* at 508-09.

The second question in determining proximate cause is whether ingestion of Ortho's oral contraceptive caused Chapman's thrombophlebitis. Ortho's brief on appeal does not challenge the jury's finding in the affirmative in this case, therefore we do not address this question except to note that Chapman presented expert testimony in support of this finding.

We conclude that the trial court did not commit error in overruling Ortho's motion for judgment on the evidence.

II.

Because of our disposition of this case, it is unnecessary to deal with the issues raised by Ortho respecting the trial court's instructions given to the jury.

III.

Ortho contends that the trial court erred in admitting certain exhibits, those being a Federal Drug Administration-mandated "Patient Warning" from August, 1970, an Ortho-Novum 2 mg. package insert from January, 1970, and an advertisement of Ortho's oral contraceptive in a January 15, 1970 magazine directed primarily to obstetricians and

gynecologists, which Chapman's doctor never saw. Ortho argues that the admission of post-occurrence remedial measures taken by a defendant to show negligence is contrary to the law in Indiana, citing *Terre Haute & Indianapolis R.R. v. Clem* (1890), 123 Ind. 15, 23 N.E. 965, and *Dudley Sports Co. v. Schmitt* (1972), 151 Ind.App. 217, 279 N.E.2d 266.

As we noted earlier, the knowledge chargeable to a manufacturer is limited to what was known at the time the plaintiff was taking the drug in question. *Basko v. Sterling Drug, Inc., supra*, at 426. The duty to warn continues throughout this period. *Schenebeck v. Sterling Drug, Inc., supra.* Chapman used Ortho's oral contraceptive until after her emergency surgery on January 15, 1970, when she discontinued it at the urging of the doctor who performed the operation. Therefore we do not see how an advertisement in a magazine dated January 15, 1970, can be characterized as a *post*-occurrence remedial measure.

The Patient Warning is clearly another matter, however. The trial court admitted this exhibit for the limited purpose of showing examples of the kind of caution which could have been given, and not as evidence of negligence on the part of Ortho. Chapman urges the correctness of the trial court's action both on the ground relied on by that court, and on the ground that the rule excluding evidence of post-accident remedial measures is not applicable in actions under section 402A of the Restatement of Torts.

The "caution" exception relied on by the trial court relates to the feasibility of taking certain precautions being proved by a showing that such precautions were in fact subsequently taken. It must be noted that this exception is a development of the exception permitting evidence of subsequent remedial measures for rebuttal or impeachment purposes. *See, e.g., Hickey v. Kansas City Southern R. Co.* (Mo. 1956), 290 S.W.2d 58 (evidence of subsequent precautions admissible to rebut contention that conditions could not be made safer); *American Airlines Inc. v. United States* (5th Cir. 1969), 418 F.2d 180 (evidence of subsequent precautions not admissible to show antecedent negligence but may be used for rebuttal or impeachment); *Hyndman v. Penn. R.R. Co.* (1959), 396 Pa. 190, 152 A.2d 251 (evidence of post-accident posting of warning sign admissible to rebut defendant's con-

tention that the cost of doing so was excessive in view of the risk); *Grawey v. Board of Road Comm'rs.* (1973), 48 Mich.App. 742, 211 N.W.2d 68 (evidence that road repaired after accident would have been admissible in rebuttal if commissioners had defended on ground of insufficient funds to make repairs; however, plaintiff not permitted to anticipate defense). Thus, the traditional rule as embodied in the Federal Rules of Evidence allows evidence of subsequent measures to be admitted, "when offered for another purpose, such as proving ownership, control, *or feasibility of precautionary measures, if controverted,* or impeachment." (emphasis added). The Advisory Committee's Note adds:

> The requirement that the other purpose be controverted calls for automatic exclusion unless a genuine issue be present and allows the opposing party to lay the groundwork for exclusion by making an admission. Otherwise the factors of undue prejudice, confusion of issues, misleading the jury, and waste of time remain for consideration under Rule 403.

There is some case law to the contrary, particularly *Brown v. Quick Mix Co.* (1969), 75 Wash.2d 833, 454 P.2d 205, 209, wherein the court expressly held such evidence "competent regardless of whether the issue is part of the plaintiff's case . . . or [whether] the defendant inject[ed] it as a defense." We feel the more accurate understanding of the law was demonstrated by the dissenting judge, who stated that to allow the plaintiff to raise the feasibility issue lets the jury find the defendant negligent "on evidence admitted on an issue which it neither created nor contested." The danger in permitting this is discussed in 2 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE—UNITED STATES RULES, ¶ 407-14 to -15:

> [T]his exception is troublesome because the feasibility of a precaution may bear on whether it was negligent not to have taken the precaution; thus, negligence and feasibility are often not distant issues. There is no difficulty when the defendants open up the issue by claiming . . . that further precautionary measures were not practicable or feasible. By raising the issue of feasibility defendant in effect has waived the protection of Rule 407 [which generally bars the admission of subsequent remedial measures], for it would be unfair not to allow the plaintiff to meet the issue by showing defendant's conflicting conduct—the subsequent remedial measures.

Allowing a plaintiff to raise feasibility would incapacitate the general

rule. *See* 2 WEINSTEIN'S EVIDENCE, supra, ¶ 407[01], at p. 407-6, n.7. and authorities cited therein.

Chapman cites *Lolie v. Ohio Brass Co.* (7th Cir. 1974), 502 F.2d 741, as adopting this "caution" exception. That case, however, concerned strict liability for the defective design of metal clips holding a cable to the roof of a mine. The cable fell and a miner was killed. After the accident, a State mine inspector directed the mine operator to tie the cable in place every sixty feet to give additional support. The court held that the exclusion of this subsequent precaution from evidence was not reversible error, although it should have been admitted. The court stated that in a defective design case, a plaintiff must prove that the product as designed is incapable of preventing the injury complained of, that there is an alternate design which would have prevented the injury, and that the alternative design is feasible. 502 F.2d at 744. The admissibility of evidence of subsequent precautions in this kind of case is not irreconcilable with the general exclusionary rule and its exceptions embodied in Rule 407. Feasibility is in issue by reason of the nature of the case,[15] and the defendant has the opportunity to concede the issue.[16]

The present case is not at all similar. There is no need for the plaintiff to prove the defendant's practical ability to print warnings. The defendant never claimed it could not. If the evidence was offered to show an example of a reasonable mode of conveying a warning, it is irrelevant because there was as a matter of law no duty to directly warn the patient during the time in question. If the purpose of showing a caution which could have been made referred to the content, then it clearly was an attempt to prove that "because the world grows wiser as it get older, therefore it was foolish before." *Columbia & P.S. R. Co. v. Hawthorne* (1892), 144 U.S. 202, quoting *Hart v. Railway*, 21 Law. T. (N.S.) 261, 263. This is exactly what the exclusionary rule proscribes.

---

15. In *Hoppe v. Midwest Conveyor Co.* (8th Cir. 1973), 485 F.2d 1196, 1202, another defective design case, the court stated that evidence of post-accident design modifications is admissible because such a case "encompasses many factors not generally relevant to ordinary negligence in tort cases."

16. *See Haysom v. Coleman Lantern Co., Inc.* (Wash. 1978), 573 P.2d 785, 791. However, the court refused to adopt a rule of "universal admissibility of post-injury changes," although defective design was in issue.

As its second ground for the admissibility of this evidence, Champman relies on *Ault v. International Harvester Co.* (1975), 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148, for the proposition that the exclusionary rule is inapplicable in strict liability cases. The reasoning of that case is, in essence, that the rule relates to proof of negligence, the reasonableness of the defendant's conduct, whereas strict liability theory is concerned only with product defects regardless of negligence. In addition, it is reasoned that the policy underlying the rule loses force where "contemporary corporate mass producer[s]" are concerned, therefore the rule operates only as a shield to liability.

The first argument is beside the point. The defect attributable to the product in this case is not in the design or manufacture of the drug, but in the failure to adequately warn of the dangers in its use. Thus, inquiry must focus on the conduct of the defendant:

> [W]here the duty to warn is under consideration, the standard of strict liability is essentially similar to the standard for establishing negligence. The rule imposing obligation on the manufacturer or seller to give suitable warning of a dangerous propensity of an article produced or sold, and the rule conditioning liability on the fact of knowledge or reason to acquire knowledge of a dangerous propensity, are the rules fixing the duties of care and are part of the law of negligence.

72 C.J.S. *Products Liability* § 25 (1978 Supp.).

More on point than *Ault, supra,* is *Smith v. E. R. Squibb & Sons, Inc., supra,* which involved a wrongful death action, based on negligence and implied warranty theories, for failure to adequately warn of dangers associated with the use of an x-ray contrast medium produced by the defendant. With regard to the evidence question the court held:

> Defendant argues, however, that even if the proposed exhibits were inadmissible to prove negligence, they should have been admitted under plaintiff's implied warranty count to prove the product was defective. We disagree. Inasmuch as the plaintiff's entire case was built around proof of an inadequate warning, a negligence concept, . . . the theoretical distinction between negligence and implied warranty may not be exploited to obviate the policy reasons for the exclusionary rule.

245 N.W.2d at 58. We agree completely, and find the trial court erred.

Finally, the policy argument in *Ault* requires some response here. The court in *Ault* reasoned:

> Neverthless, courts and legislatures have frequently retained the exclusionary rule in negligence cases as a matter of "public policy," reasoning that the exclusion of such evidence may be necessary to avoid deterring individuals from making improvements or repairs after an accident has occurred.
>
> . . .
>
> When the context is transformed from a typical negligence setting to the modern products liability field, however, the "public policy" assumptions justifying this evidentiary rule are no longer valid. The contemporary corporate mass producer of goods, the normal products liability defendant, manufactures tens of thousands of units of goods; it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. In the products liability area, the exclusionary rule of section 1151 does not affect the primary conduct of the mass producer of goods, but serves merely as a shield against potential liability. In short, the purpose of section 1151 is not applicable to a strict liability case and hence its exclusionary rule should not be gratuitously extended to that field.

528 P.2d at 1151-52.

The rule excluding evidence of post-accident repairs or precautions was first established by the United States Supreme Court in *Columbia & P.S. R. Co. v. Hawthorne, supra.* That case concerned a suit for personal injuries caused by a defective machine. The Court ruled that evidence of subsequent alterations or repair of the machinery was incompetent on three grounds

> [T]he taking of such precautions against the future is not to be construed as an admission of responsibility for the past, has no legitimate tendency to prove that the defendant had been negligent before the accident happened, and is calculated to distract the minds of the jury from the real issue, and to create a prejudice against the defendant.

144 U.S. at 207; 12 S.Ct. at 593. The Court approved the reasoning expressed in *Morse v. Railway Co.* (1883), 30 Minn. 465, 16 N.W. 358:

> [S]uch acts afforded no legitimate basis for construing such an act as a admission of previous neglect of duty. A person may have exercised all the care which the law required, and yet, in the light of his new experience, after an unexpected accident has occurred, and as a measure of extreme caution, he may adopt additional safeguards. The more careful a person is, the more regard he has for the lives of others, the more likely he would be to do so; and it would seem unjust that he could not do so without being liable to have such acts construed as an admission of prior negligence. We think such a rule puts an *unfair interpretation upon human conduct*, and virtually holds out an inducement for continued negligence. (Emphasis added).

Also the Court quoted *Hart v. Railway*, 21 Law T. (N.S.) 261, 263, as stating the same rule:

> People do not furnish evidence against themselves simply by adopting a new plan in order to prevent the recurrence of an accident. I think that a proposition to the contrary would be barbarous. It would be, as I have often had occasion to tell juries, to hold that, because the world gets wiser as it gets older, therefore it was foolish before.

Although courts have emphasized the public policy considerations in applying the rule, these considerations are not its keystone. Rather, lack of probative value is the fundamental reason for excluding such evidence. Although such evidence may be admissible under the modern, more liberal test of relevance, the attendant danger that a jury would misconstrue and misapply it to the prejudice of the accused is so great as to require exclusion. 2 J. WIGMORE, EVIDENCE § 283 (3d ed. 1940). A danger particularly relevant to the present case is that a jury, influenced by hindsight evidence, might apply an artificially high standard in determining the adequacy of warnings. With respect to this issue, the Indiana Supreme Court in *Terre Haute v. I. R. Co. v. Clem, supra,* quoted from *Nalley v. Carpet Co.,* 51 Conn. 524:

> The fact that an accident has happened, and a person has been injured, immediately puts a party on a higher plane of diligence and duty, from which he acts with a view of preventing the possibility

of a similar accident, which should operate to commend rather than condemn the person so acting. If the subsequent act is made to reflect back upon the prior one, although it is done upon the theory that it is a mere admission, yet it virtually introduces into the transaction a new element and test of negligence, which has no business there, not being in existence at the time.

Even "contemporary corporate mass producer[s]" are entitled to be judged by a fair standard.

The evidence in this case presented the jury with a very close question regarding the adequacy of Ortho's warnings. Therefore we cannot say the error in admitting this evidence was harmless.

We reverse, and remand this cause for new trial.

Hoffman, J. concurs.

Lowdermilk, J. dissents with opinion.

## DISSENTING OPINION

LOWDERMILK, J. — I must respectfully dissent. This is a products liability action in which defendant-appellant Ortho Pharmaceutical Corporation (Ortho) appeals from a judgment in favor of plaintiff-appellee Dorothy M. Chapman for $100,000, which judgment was awarded for injuries sustained by Chapman after using Ortho-Novum 2 mg., an oral contraceptive manufactured by Ortho.

In July 1968 a Dr. Swaim prescribed an oral contraceptive, Ortho-Novum 2 mg., for Chapman, which she did not begin taking until November or December, 1968. Chapman was an obese woman who was otherwise in good health at the time she began taking Ortho-Novum 2 mg., which she continued to take until January 1970 when she was admitted to the emergency room at a hospital while vacationing in Kentucky and was treated surgically for severe thrombophlebitis (blood clots) in her legs.

As a result of her thrombophlebitis Chapman had to undergo several operations and had to spend much time in the hospital. She now must wear heavy-duty support hose, and there is an increased probability that thrombophlebitis will affect her the rest of her life.

At trial a Dr. Hillabrand testified that, given Chapman's good state of health in 1968 and 1969 and her health history up to that time, the only logical cause for her thrombophlebitis was her use of Ortho-Novum 2 mg., which had been identified by certain medical studies of that time as a causative and aggravator of thrombophlebitis in women. It was Dr. Hillabrand's opinion that Ortho's 1968 ad 1969 warnings concerning the relationship of the use of Ortho Novum 2 mg. to increased occurrence of thrombophlebitis were inadequate and incomplete.

Dr. Swaim, the prescribing physician, testified that in prescribing Ortho-Novum 2 mg. he relied primarily upon the warning contained in the 1968 Physician's Desk Reference (P.D.R.). The P.D.R. is a book which identifies all the major prescription drugs on the market, describes the chemical makeup of each drug, indicates the purposes for which a given drug is used, gives warnings as to those persons who should not use a certain drug, and tells what side effects and serious complications might result from the use of a given drug. This descriptive, prescriptive, and cautionary information is furnished to the publishers of P.D.R. by the various drug manufacturers. The P.D.R. is supplemented and revised throughout the year through periodic mailings from the publisher. Dr. Swaim testified that when he prescribed the Ortho-Novum 2 mg. for Chapman, the 1968 P.D.R., though it stated that women with thrombophlebitis should not take Ortho-Novum 2mg. and occassionally thrombophlebitis would occur in the course of taking Ortho-Novum 2 mg., contained no warning that a statistically significant relationship between the use of oral contraceptives and thrombophlebitis had been determined.

The June, 1968 package insert, which Dr. Swaim testified that he did not read, and the 1969 P.D.R. contained the following language, which conformed to the Federal Food and Drug Administration's requirement for uniform labeling of package inserts for oral contraceptives:

"WARNINGS

1.  The physician should be alert to the earliest manifestations of thrombotic disorders (thrombophlebitis, cerebrovascular disorders, pulmonary embolism, and retinal thrombosis). Should any of these occur or be suspected, the drug should be discontinued immediately.

Studies conducted in Great Britain and reported in April 1968 estimate there is a seven to tenfold increase in mortality and morbidity due to thromboembolic diseases in women taking oral contraceptives. In these controlled retrospective studies, involving 36 reported deaths and 58 hospitalizations due to 'idiopathic' thromoembolism, statistical evaluation indicates that the differences observed between users and non-users were highly significant.

The conclusions reached in the studies are summarized in the table below:

Comparison of Mortality and Hospitalization Rates
Due to Thromboembolic Disease in Users and Non-Users
of Oral Contraceptives in Britain

| Category | Age 20-34 | Age 35-44 | Hospitalization Morbidity Age 20-44 |
|---|---|---|---|
| Users of Oral Contraceptives | 1.5/100,000 | 3.9/100,000 | 47/100,000 |
| Non-Users | 0.2/100,000 | 0.5/100,000 | 5/100,000 |

No comparable studies are yet available in the United States. The British data, especially as they indicate the magnitude of the increased risk to the individual patient, cannot be directly applied to women in other countries in which the incidences of spontaneously occurring thromboembolic disease may be different.

\* \* \*

ADVERSE REACTIONS OBSERVED IN
PATIENTS RECEIVING ORAL CONTRACEPTIVES

A statistically significant association has been demonstrated between use of oral contraceptives and the following serious adverse reactions:

Thrombophlebitis
Pulmonary embolism."

Dr. Swaim testified that, when he prescribed an oral contraceptive for Chapman in July, 1968, he was aware that certain researchers were claiming that a cause-effect relationship existed between thrombophlebitis and the use of oral contraceptives. However, he stated that

there was much conflict in the literature of that time and that he felt that the oral contraceptives were completely safe for use by Chapman in that Chapman was in excellent health for a person of her age and weight and had shown no previous signs of vascular disease.

Chapman's suit against Ortho was for negligence, strict liability, and breach of warranty, all based upon Ortho's failure to provide a proper warning. The jury returned a verdict for Chapman in the amount of $100,000.

As the majority opinion points out, Ortho contends that the trial court erred in admitting certain exhibits which contained more detailed, more specific, and more accurate warnings than those contained in 1969 P.D.R. These warnings were an F.D.A.-mandated "Patient Warning" from August, 1970, an Ortho-Novum 2 mg. package insert from January, 1970, and an advertisement from a magazine which was directed primarily to obstetricians and gynecologists, a January 1970 magazine which Dr. Swaim never saw. Ortho argues that the admission of post-occurrence remedial measures by a defendant to show negligence is contrary to the law as it exists in Indiana. He cites as his authority *Terre Haute & Indianapolis R.R. v. Clem* (1890), 123 Ind. 15, 23 N.E. 965, and *Dudley Sports Co. v. Schmitt* (1972), 151 Ind.App. 217, 279 N.E.2d 266.

I agree with the majority opinion that post-accident remedial measures by a defendant are not admissible to show negligence. See *Clem, supra,* and *Dudley Sports Co., supra.* However, in the case at bar the post-prescription warnings were not admitted to show negligence on the part of Ortho; they were admitted to show the kind of caution which could have been given. The trial court specifically told the jury that these post-occurrence warnings were being admitted solely for the limited purpose of showing examples of the kind of caution which could have been given and not as evidence of negligence on the part of Ortho.

In *Dudley, supra,* at pages 277-278 of 279 N.E.2d this court stated the following:

> "In negligence actions, an admission of negligence is often sought to be inferred from remedial conduct by the defendant subsequent to the happening of an accident. Goshen v. England (1889), 119 Ind. 368, 21 N.E. 977. Such evidence is generally inadmissible, even though it seems to suggest a consciousness of the wrong. Terre

Haute & Indianapolis R.R. Co. v. Clem (1889), 123 Ind. 15, 23 N.E. 965.

However, the reasons to declare evidence of subsequent remedial conduct inadmissible are not appropriate when the evidence is relevant to prove facts other than negligence. 2 Jones, The Law of Evidence, § 387. . . ."

The post-prescriptive warnings in the case at bar were admitted to prove facts other than negligence. They were admitted to show examples of cautions which could have been given by Ortho at the time that Dr. Swaim prescribed an oral contraceptive for Chapman in July 1968. This "caution" exception to the general rule and others like it have been adopted by the courts of other jurisdictions,[1] and is explained by the Supreme Court of Pennsylvania in *Hydman v. Pennsylvania Railroad Company* (1959), 396 Pa. 190, 152 A.2d 251, 256, as follows:

"The appellant also argues that the trial court was in error in refusing to grant its motion for a new trial. It claims that it was reversible error for the court below to admit evidence that after the accident defendant attached to the tower in question signs reading 'Danger, Live wire, Keep off.'

The law of this Commonwealth is clear that evidence of subsequent repairs or precautions is not admissible for the purpose of proving antecedent negligence. Baran v. Reading Iron Co., 1902, 202 Pa. 274, 51 A. 979. Appellant's argument was more than adequately handled by the court below when it said:

'A detailed review of the record discloses that such evidence was admitted for the special purpose of demonstrating to the jury one of the precautionary steps, which could have been taken by defendant without hindering its operation if the jury found that such measure was required. The jury was carefully instructed to so regard it at the time it was introduced into evidence. The limited scope of the item of proof was plainly set out to the jury in careful instructions by our President Judge Eugene V. Alessandroni who presided over the trial. We believe the jury to have been adequately apprised that

---

1. See *American Airlines Inc. v. United States*, 418 F.2d 180 (5th Cir. 1969); *Lolie v. Ohio Brass Co.*, 502 F.2d 741 (7th Cir. 1974); and Rule 407, Fed.R.Evid.

the testimony had no bearing on antecedent negligence but was only to show a caution which was not costly or burdensome to the defendant in relation to the risk or danger invovled.' "

I would hold that the trial court did not err in admitting evidence of the remedial measures taken in Ortho's subsequent warnings when such evidence was admitted solely for the limited purpose of showing certain precautionary information which was available and could have been used by Ortho in 1968.

The majority opinion states that the caution exception to the rule prohibiting the admission of post-occurrence remedial actions is not applicable because the feasibility of taking such remedial action was not in dispute in the case at bar. I disagree. Even though the disputed evidence was admitted during Chapman's case in chief, it was, nonetheless, a fact that Ortho contended that it was not feasible for it to have given a warning which included the statistical data which were contained in the British studies in July of 1968 because such were not then available to Ortho. Chapman simply presented evidence which showed that those statistics were then available and that the later warning, as used in the 1970 package insert, was an example of the kind of caution which could have been provided to Chapman's doctor in July of 1968. Therefore, I am of the opinion that the 1970 package insert was properly admitted under the caution exception to the rule which prohibits the admission of post-occurrence remedial actions.

Additionally, it should be pointed out that, in my opinion, the common law restrictions against the admission of evidence of remedial measures taken do not apply to products liability cases where the issue of strict liability is presented. This principle is explained very well by the Supreme Court of California in *Ault v. International Harvester Company* (1975), 13 Cal.3d 113, 117 Cal. Rptr. 812, 528 P.2d 1148. On page 1150 of 528 P.2d 1150, the following footnote appears:

"1. Section 1151 provides, 'When, after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously, would have tended to make the event less likely to occur, evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with

the event.' All statutory references will be to the Evidence Code, unless otherwise noted."

The following textual material from pages 1150-1152 of 528 P.2d is set forth at length:

"Section 1151 by its own terms excludes evidence of subsequent remedial or precautionary measures only when such evidence is offered to prove negligence or culpable conduct. In an action based upon, strict liability against a manufacturer, negligence or culpability is not a necessary ingredient. The plaintiff may recover if he establishes that the product was defective, and he need not show that the defendants breached a duty of due care. (Greeman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 62-63, 27 Cal.Rptr. 697, 377 P.2d 897.)

\* \* \*

The history and purpose of section 1151 compel our conclusion that it was not intended to apply to cases found on the theory of strict liability in a products liability action. According to its draftsmen, section 1151 was intended merely to codify 'well settled law.' (Law Revision Com. comment to Evid. Code, § 1151.) The rule excluding evidence of subsequent repairs originally rested on the notion that such repairs were completely *irrelevant* to the issue of defendant's *negligence* at the time of the accident. Thus, the first case to adopt this rule in California, Sappenfield v. Main-St., etc. R.R. Co. (1891) 91 Cal. 48, 62, 27 P. 590, 593, stressed that 'The negligence of the employer, which renders him responsible for the accident, depends upon what he did and knew before the accident, and must be established by facts and circumstances which preceded it, and not by acts done by him after the occurrence.' (See, e.g., Helling v. Schindler (1904) 145 Cal. 303, 312-315, 78 P. 710.)

On the other hand a number of more recent cases have recognized several exceptions to the rule of exclusion in negligence cases. For example, several decisions acknowledge that evidence of subsequent repairs is relevant to the issue of negligence, for if the changes occur closely in time they may well illustrate the feasibility of the improvement at the time of the accident, one of the normal elements in the negligence calculus. (See, e.g. Johnson v. United States (D.Mont. 1958) 163 F. Supp. 388, 395; Baldwin Contracting Co. v. Winston Steel Works, Inc. (1965) 236 Cal.App.2d 565, 573, 46 Cal.Rptr. 421; Varas v. Barco Mfg. Co. (1962) 205 Cal.App.2d 246, 259, 22 Cal.Rptr. 737.)

Nevertheless, courts and legislatures have frequently retained the exclusionary rule in negligence cases as a matter of 'public policy,' reasoning that the exclusion of such evidence may be necessary to avoid deterring individuals from making improvements or repairs after an accident has occurred. Section 1151 rests explicitly on this 'public policy' rationale. In explaining the purpose of the section, the draftsmen's comment states: 'The admission of evidence of subsequent repairs *to prove negligence* would substantially discourage persons from making repairs after the occurrence of an accident.' (Emphasis added.) (Law Revision Com. comment to Evid.Code, § 1151.)

While the provisions of section 1151 may fulfill this anti-deterrent function in the typical negligence action, the provision plays no comparable role in the products liability field. Historically, the common law rule codified in section 1151 was developed with reference to the usual negligence action, in which a pedestrian fell into a hole in a sidewalk (see, e.g., City of Miami Beach v. Wolfe (Fla. 1955) 83 So.2d 774) or a plaintiff was injured on unstable stairs (see, e.g., Hadges v. New York Rapid Transit Corporation (1940), 259 A.D. 154, 18 N.Y.S.2d 304); in such circumstances, it may be realistic to assume that a landowner or potential defendant might be deterred from making repairs if such repairs could be used against him in determining liability for the initial accident.

When the context is transformed from a typical negligence setting to the modern products liability field, however, the 'public policy' assumptions justifying this evidentiary rule are no longer valid. The contemporary corporate mass producer of goods, the normal products liability defendant, manufactures tens of thousands of units of goods; it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. In the products liability area, the exclusionary rule of section 1151 does not effect the primary conduct of the mass producer of goods, but serves merely as a shield against potential liability. In short, the purpose of section 1151 is not applicable to a strict liability case and hence its exclusionary rule should not be gratuitously extended to that field.

This view has been advanced by others. It has been pointed out

that not only is the policy of encouraging repairs and improvements of doubtful validity in an action for strict liability since it is in the economic self interest of a manufacturer to improve and repair defective products, but that the application of the rule would be contrary to the public policy of encouraging the distributor of mass-produced goods to market safer products. (Note, Products Liability and Evidence of Subsequent Repairs, 1972 Duke L.J. 837, 845-852.)" (Footnotes omitted) (Original emphasis)

I find the reasoning of the Supreme Court of California to be persuasive and would hold that the prohibition against the introduction of evidence which shows that remedial measures were taken by a defendant does not apply to cases where the issue of strict liability has been presented. This holding in no way affects the common law rule that evidence of such remedial measures shall not be admitted to show a defendant's admission of negligence.

The majority opinion asserts that for the purpose of applying the post-occurrence remedy rule there is no practical distinction between the typical negligence case and a strict liability action which is based upon an inadequate manufacturer's warning. I disagree. Although a reasonable foreseeability test is utilized to determine a breach of duty in both the negligence action and the products liability action which is based upon an inadequate warning, the theories of recovery and the underlying public policies which support those theories are different.

In a negligence action, a breach of the duty to warn of a defective or dangerous condition of which the one who owes the duty has actual or constructive knowledge results in *liability* for damages which proximately resulted from that breach. In a strict liability action a breach of the duty to warn of an inherently dangerous condition of which the manufacturer should be cognizant results in a defective product, the dispensation of which renders the manufacturer strictly liable for any damages caused by that product when used in a manner which was reasonably foreseeable by the manufacturer.

72 C.J.S. Supp. pp. 10-12, Products Liability § 7, states:

"Generally speaking, the doctrine of 'strict liability' is a rule under which liability is imposed, without regard to the exercise of reasonable care, on one who sells a product in a defective condi-

tion unreasonably dangerous to the user or consumer, for harm caused to the ultimate user or consumer, if the seller is engaged in the business of selling such product, and the product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. . . .

*Strict liability is generally regarded as a doctrine rooted in considerations of public policy. The purpose behind such policy has been to insure that the costs of injuries resulting from defective products are borne, as a cost of doing business, by the persons who put the products into the channels of commerce rather than by the injured persons who ordinarily are powerless to protect themselves, without imposing upon such persons the problems inherent in pursuing negligence remedies.* As otherwise stated, this policy involves the placing of liability on the party primarily responsible, who is in a position to most effectively reduce the hazards to life and health arising from their products, and the securing of an adequate remedy for the injured plaintiff. The imposition of strict liability involves the task of balancing between the need for adequate recovery for the person injured and the need for viable enterprise, and weighing the means available for avoiding the risk of harm against the utility of the product.

The basis for the cause of action is said to be the existence of a defect in, or a condition unreasonably dangerous for the intended use of, the product. The primary concern of strict liability is with the fitness of the product. . . .

However the concepts of duty, and fault, have not been discarded entirely, according to some authority, and the requirement of care does not appear in cases where a defect is deemed to result notwithstanding the product is constructed as intended. . . . The strict liability theory is not one of unlimited application. It does not subject a seller or manufacturer to absolute liability, or to liability simply because of the occurrence of any injury from the use of a product. Several factors are pertinent in applying the doctrine, such as the nature of the ultimate transaction, the methods employed in distributing the product, and the type of activity in which the user was engaged when the harm occurred." (Footnotes omitted) (Our emphasis)

The majority opinion in the case at bar has effectively limited Chapman in her pursuit of a remedy in such a way that she can only seek her remedy on a negligence theory, thereby obviating the public policies which underlie her attempt to recover in strict liability. Even though

the test of reasonable foreseeability is the same for determining the adequacy of the warning for both theories of recovery, the underlying policies are not. The problem is still one of a manufacturer who dispensed a defective product.

In 72 C.J.S. Supp. pp. 38-39, Products Liability § 25, it states:

"A product may be deemed defective, although faultlessly made, if it is unreasonably dangerous to place the product in the hands of the user without a suitable warning, and the product is supplied and no warning is given, or where a product is sold without adequate warning. . . .

\* \* \*

*The duty of a supplier of products to warn of dangers incident to their use exists under both strict liability and negligence theories of recovery; and liability may be imposed under either strict liability or negligence rules where there is a breach of such a duty.* The duty to warn arises out of considerations of public policy, which requires that a supplier, as an incident to doing business, assume the added burden of precaution by adding a warning where required. This burden is rightly borne as one of the costs of producing and selling a commodity to members of the public whose knowledge of the potential danger to themselves may be greatly inferior to that possessed by the supplier, especially a manufacturer. In light of this policy, the failure to give warning is not excusable on the grounds of its possible adverse effect on business." (Footnotes omitted) (Our emphasis)

I am of the opinion the disputed evidence was properly admitted and that the judgment should be affirmed.

NOTE—Reported at 388 N.E.2d 541.