[Civ. No. 21933. First Dist., Div. Two. Aug. 17, 1965.]

BALDWIN CONTRACTING COMPANY, Plaintiff and Respondent, v. WINSTON STEEL WORKS, INC., et al., Defendants and Appellants.

O'Connor, Moran, Cohn & Lynch, Harold H. Cohn, Eugene F. Lynch, Donald F. Farbstein and Hession, Robb, Creedon, Hamlin & Kelly for Defendants and Appellants.

Bledsoe, Smith, Cathcart, Johnson & Rogers and R. S. Cathcart for Plaintiff and Respondent.

TAYLOR, J.—Defendants, Winston Steel Works, Inc. (hereafter referred to as Winston), and Sacramento Erectors, Inc. (hereafter referred to as Sacramento), construction subcontractors, appeal from a judgment entered on a directed verdict, holding that they are obligated to indemnify the general contractor, plaintiff, Baldwin Construction Company (hereafter referred to as Baldwin), and from the orders denying their motions for a judgment notwithstanding the verdict.[1] Winston appeals from the order denying its motion for a nonsuit.[2] The main questions presented are whether Baldwin was affirmatively negligent, the effect of Winston's alleged indemnity agreements, and Sacramento's liability.

By the instant action, Baldwin sought to recover the amount it expended in defending and settling an action brought by Owen Steele, Sacramento's foreman. Steele was injured on May 17, 1956, when he fell after coming in contact with certain high voltage wires, and in 1957, filed a personal injury action against Baldwin, Pacific Gas and Electric Company, and the owner of the building, Gladding-

---

[1] These orders are appealable (Code Civ. Proc., § 963, subd. 2).

[2] This order, although reviewable on appeal from the judgment, is not appealable and the appeal must be dismissed (*Torres* v. *City of Los Angeles*, 58 Cal.2d 35, 55 [22 Cal.Rptr. 866, 372 P.2d 906]).

McBean & Company (hereafter referred to as McBean). The judgment in that action, now final, exonerated McBean and awarded Steele $90,000 against Baldwin and Pacific Gas and Electric Company. Baldwin and Pacific Gas and Electric Company settled the judgment for $70,000, of which Baldwin paid $35,000 and expended $11,500 in defending the action.

Baldwin's complaint to recover the total amount from Winston and Sacramento alleged both breach of an express contract of indemnity and a cause of action based on implied indemnity. The trial court directed a verdict in favor of Baldwin against Winston on the basis of the express contract of indemnity and directed the verdict in favor of Baldwin against Sacramento on grounds of noncontractual implied indemnity.

■■ We note preliminarily that in determining whether the court properly granted respondent's motion for a directed verdict, we must view the evidence in the light most favorable to appellants, disregard all conflicts in the evidence, and indulge all reasonable inferences in their favor (*Beck* v. *San Francisco etc. Sch. Dist.*, 225 Cal.App.2d 503 [37 Cal.Rptr. 471]). This same advantage in viewing the evidence must be extended to respondent in considering whether the court properly denied appellants' motions for a nonsuit and judgment notwithstanding the verdict. A trial court's power to direct a verdict or grant a judgment notwithstanding the verdict is subject to the same limitation as its power to grant a nonsuit (*Cain* v. *Friend,* 171 Cal.App.2d 806 [341 P.2d 753]).

The record discloses that in 1955, McBean entered into a written contract with Baldwin for the construction of certain large scale improvements at McBean's ceramics products manufacturing installation in Placer County, California. This contract included the construction of several new outdoor buildings. In 1956, Baldwin subcontracted the construction and installation of one of these buildings, No. 5, to Winston, a structural steel fabricator. Winston, in turn, subcontracted the erection of the building to Sacramento. Winston's contract with Baldwin included provisions holding Baldwin harmless from liability for injury or damages incurred by reason of any act of Winston, its agents or employees.

The site for building No. 5 was chosen by McBean and prepared by Baldwin who laid the concrete foundation floor

and anchors for the building. Winston received the specifications for building No. 5 from Baldwin and after manufacturing the steel parts sent them to the chosen site.

Baldwin's superintendent and foreman on the McBean job from September 1955 until its completion several years later was Troy Phillips. The foundation and floor for building No. 5 were put in about a month before the accident in which Steele was injured. At this time, Phillips was aware that the high voltage wires were overhead and would run over building No. 5 when it was erected.

Several days before the accident, Sacramento's field superintendent, Fred Gerdes, arrived to get the steel ready for erection. He observed the high voltage wires and immediately contacted Phillips about them. Fred Gerdes and his brother, Orville Gerdes [Sacramento's foreman in the field], both asked Phillips to turn off the wires because they did not think it was possible to build a barricade. Phillips had just had a similar request from another subcontractor, Palm Iron Works, the steel erection contractor for building No. 4, and had been told by Mr. Kinder of McBean that the wires could not be shut off because they were the main wires of the plant.

According to Fred Gerdes, Phillips told him that the distance of the wires above the proposed building had been measured without indicating who had measured them. He also told Gerdes that they would have a clearance of approximately 13 feet from the highest point of the building and that this was in accord with the safety requirements which specified a minimum of 12 feet of clearance. It was made clear that the 13 feet was computed not from the foundation but from the highest point of the building to the wires. Phillips assured the Gerdes brothers that it was safe and that they could go ahead and erect the building without doing anything about the wires. Phillips either denied or was unable to recall any conversation with the Gerdes brothers but did admit that on the day of the accident, he looked up and estimated to someone at the site that the wire clearance was 14 feet above the structure.

Owen Steele, Sacramento's foreman, had charge of the equipment and all operational details of the job. He received his orders from his immediate superior, Fred Gerdes. Steele had arrived at the site the day before the accident and began to erect the building with his crew. He saw the high tension

wires, knew that they could not be shut off, and cautioned his men to be careful. During the erection of the building on the day before the accident, Steele observed Phillips walking around and inspecting the progress of building No. 5. By that evening, the entire outline of the building was completed. Because of the overhead wires, Sacramento had to order and use a different type of crane so that they could erect the building without coming in contact with the wires. Sacramento issued orders to Steele to go ahead and Baldwin was never requested by either Winston or Sacramento to build a protective barricade.

On the morning of the accident, May 17, 1956, Phillips, after inspecting building No. 5, warned Steele and the other iron workers to be very careful about the hot wires above when they worked on top of the building to put in the sheeting for the roof. Phillips admitted that he was aware, prior to Steele's accident, that the wires constituted a danger. About five to ten minutes before the accident, Phillips, from another place on a nearby building, saw Steele standing on top of a rafter of building No. 5 underneath the wires. The record discloses no warning to Steele at that time. The accident occurred when another employee of Sacramento handed Steele a 25 foot iron rake angle to be used to fasten the sheets of corrugated metal to the building. Steele, a 6-footer, in the process of turning the rake angle around, struck the overhead tension wires and fell to the floor of the building. The nature and extent of his injuries are not in issue here.

After the accident, at the direction of Phillips, Baldwin's carpenters put up a wooden barricade. Baldwin had the only carpenters on the whole project. All of Sacramento's employees were steel and iron workers. One of the two carpenters who installed the barricade estimated that the wires were about 11 feet above building No. 5 and the other estimated between 10 and 12 feet.

The principal question here is whether there was any substantial evidence that Baldwin, through its agent Phillips, was guilty of active negligence contributing proximately to Steele's injury.

The judgment obtained by Steele against Baldwin in Placer County does not establish Baldwin's active negligence as a matter of law by collateral estoppel. There were no special interrogatories addressed to the jury. The judgment could well have been based on the general contractor's com-

mon law duty to afford the subcontractor's employees a safe place to work (*Florez* v. *Groom Development Co.*, 53 Cal.2d 347, 354 [1 Cal.Rptr. 840, 348 P.2d 200]) or on the more stringent statutory liability imposed on the general contractor as an "employer" under section 6304 et seq. of the Labor Code (*Conner* v. *Utah Constr. & Mining Co.*, 231 Cal.App.2d 263, 271 [41 Cal.Rptr. 728]; *Kuntz* v. *Del E. Webb Constr. Co.*, 57 Cal.2d 100 [18 Cal.Rptr. 527, 368 P.2d 127]).

■ If Baldwin's liability to Steele was attributable solely to the failure of its subcontractors in their operations to take the necessary precautionary measures for which the general contractor is also made responsible by operation of law, Baldwin could recover the amount of the Steele judgment from Winston or from Sacramento even in the absence of a hold harmless agreement on the basis of implied indemnification (*Weyerhaeuser S.S. Co.* v. *Nacirema Operating Co.*, 355 U.S. 563, 568 [78 S.Ct. 438, 2 L.Ed.2d 491]; *San Francisco Unified Sch. Dist.* v. *California Bldg. etc. Co.*, 162 Cal. App.2d 434, 447 [328 P.2d 785]; *Cahill Bros., Inc.* v. *Clementina Co*, 208 Cal.App.2d 367, 381-382 [25 Cal.Rptr. 301]; *Alisal Sanitary Dist.* v. *Kennedy*, 180 Cal.App.2d 69, 79 [4 Cal.Rptr. 379]; *City & County of San Francisco* v. *Ho Sing*, 51 Cal.2d 127 [330 P.2d 802]; *Herrero* v. *Atkinson*, 227 Cal. App.2d 69 [38 Cal.Rptr. 490]).

■ However, if Baldwin, through its agents or employees, actively participated in the negligent acts of commission or omission which proximately resulted in Steele's injury, its right to either implied or contractual indemnification is foreclosed unless the hold harmless agreement executed by the subcontractor indemnified Baldwin in clear and specific terms against liability from its own affirmative negligence (*Harvey Machine Co.* v. *Hatzel & Buehler, Inc.*, 54 Cal.2d 445 [6 Cal.Rptr. 284, 353 P.2d 924]; *Safeway Stores, Inc.* v. *Massachusetts Bonding & Ins. Co.*, 202 Cal.App.2d 99 [20 Cal.Rptr. 820]; *Goldman* v. *Ecco-Phoenix Elec. Corp.*, 62 Cal.2d 40 [41 Cal.Rptr. 73, 396 P.2d 377]). ■ This is true even though there may have been negligent conduct on the part of the subcontractor and its employees contributing to the injury in a more serious degree than did Baldwin's (*Horn & Barker, Inc.* v. *Macco Corp.*, 228 Cal.App.2d 96, 103-104 [39 Cal.Rptr. 320]). ■ Whether the negligence is active or passive in nature is generally a question of

fact for jury determination (*Cahill Bros., Inc.* v. *Clementina Co., supra*).

■ The evidence, when viewed in a light favorable to appellants, indicates that Phillips' assertion to Sacramento's foreman Gerdes that the wire clearance was about 13 feet, was in accord with the 12-foot safety requirement, and safe for the workmen to proceed, was not based on any measurement, as Phillips represented, but was sheer guesswork. Phillips admitted that when asked about the wires, ''I just looked up there and told them fourteen feet.'' The carpenters who later built the wooden barricade estimated the clearance at from 10 to 12 feet. It was for the jury to resolve the conflicts and determine the facts concerning the clearance, whether it was prudent for Phillips to impart an off-hand estimate thereof, and what effect, if any, his assurances had on Sacramento and its employees in proceeding on the job without insisting on protective measures.

Phillips did warn all of the workers, including Steele, of the dangerous wires when he inspected the building on the morning of the accident. However, his deposition disclosed an admission, which he later denied, that he saw Steele working on top of the roof directly under the wires about five minutes before the accident and the record discloses no warning to Steele at that time.

The ease with which the hazard could have been obviated is indicated by the fact that a protective barricade was installed after the accident by two of Baldwin's carpenters, working under Phillips' direction, in about an hour's time.

■ While public policy precludes the court from considering the construction of the barricade after the accident *on the issue of liability,* such evidence is relevant and admissible as indicative of Baldwin's duty on the job (*Daggett* v. *Atchison, T. & S.F. Ry. Co.,* 48 Cal.2d 655, 661 [313 P.2d 557]) and also on the possibility or feasibility of eliminating the cause of the accident (*Williams* v. *Portland General Elec. Co.* (1952) 195 Ore. 597 [247 P.2d 494]; *Zenier* v. *Spokane International R.R. Co.* (1956) 78 Idaho 196 [300 P.2d 494]).

■ Clearly, there was sufficient evidence from which the jury might reasonably have concluded that Baldwin, through Phillips, actively participated in the negligent conduct which proximately resulted in Steele's injury, thus foreclosing its right of implied indemnity against both Sacramento and Winston. We now inquire whether the hold harmless clauses in

Winston's contract were sufficiently broad to cover Baldwin's affirmative negligence and to insure its right of *contractual indemnity* against Winston.[3]

 Mr. Justice Tobriner, in *Goldman* v. *Ecco-Phoenix Elec. Corp., supra,* stated the rule as follows: "Although the cases have held that one may provide by agreement for indemnification against his own negligence [citations], the agreement for indemnification must be clear and explicit; the agreement must be strictly construed against the indemnitee.

 In view of the general rule that an implied indemnity does not reach to protect the indemnitee from a loss to which his negligence has contributed, we must look at least for an express undertaking in the document that he is to do so. If one intends to do more than merely incorporate the general rule into the written document, he will be required to fix the greater obligation in specific terms. And the extent of the purported indemnitor's liability must be determined from an objective assessment of the language of the instrument." (P. 44.)

The court then cited *Vinnelll Co. 1. Pacific Elec. Ry. Co.,* 52 Cal.2d 411, 415 [340 P.2d 604], as illustrative and quoted the following statement therefrom with approval,

---

[3] "9. LIABILITY FOR INJURIES AND DAMAGES: *Subcontractor shall hold Contractor and Owner free and harmless from any and all liability, costs and charges arising out of injuries or damage to any and all persons, employees and/or property in any way caused by Subcontractor, its agents or employees.*" (Italics supplied.)

"10. INSURANCE: Subcontractor shall at all times carry on all operations hereunder Workmen's Compensation and Employer's Liability Insurance covering all of its employees, Contractor's Comprehensive Public Liability and Property Damage Insurance, including Automotive Public Liability and Property Damage Insurance, in companies satisfactory to Contractor. . . ."

"12. LAWS AND REGULATIONS: Subcontractor, its employees and representatives, shall at all times comply with any applicable laws, ordinances, statutes, rules and regulations, Federal, State and municipal, particularly those relating to wages, hours and working conditions. Subcontractor shall procure and pay for all permits and inspections required for any part of the work and shall furnish any bonds, security or deposits required to permit performance of the work."

"14. INDEPENDENT CONTRACTOR: Subcontractor represents to Contractor that it is fully experienced and properly qualified as an expert to perform the class of work provided for herein, and that it is properly equipped, organized and financed to handle such work. *Subcontractor shall finance its own operations hereunder, shall operate as an independent contractor and not as the agent of Contractor, and shall hold Contractor and Owner free and harmless from all liability, costs and charges by reason of any act or representations of Subcontractor, its agents or employees.*" (Italics supplied.)

" 'where the parties fail to refer expressly to negligence in their contract such failure evidences the parties' intention not to provide for indemnity for the indemnitee's negligent acts.' " (P. 45.)

The agreement in the instant case provides in paragraph 9 that Winston will hold Baldwin free and harmless for all liability, etc. arising out of injuries or damage "to any and all persons, employees and/or property in any way caused by Subcontractor, its agents or employees" and in paragraph 14 that the subcontractor shall hold the contractor harmless "from all liability, costs and charges by reason of any act or representations of Subcontractor, its agents or employees." This language falls far short of the requirements set down by the Supreme Court in the *Goldman* case.

In *Goldman,* where as here, the indemnitee relied on *Harvey Machine Co.* v. *Hatzel & Buehler, Inc.,* 54 Cal.2d 445 [6 Cal. Rptr. 284, 353 P.2d 924], the following four characteristics distinguishing *Harvey* from *Vinnell* are set forth as follows: "in *Harvey* (1) 'the indemnitee did not continue to maintain independent operations on the premises' . . . ; (2) 'The injuries did not result from some conduct or omission unrelated to the indemnitor's performance' . . . ; (3) the indemnitee's breach of duty did not take the form of 'active, affirmative misconduct, but at most passive negligence—a failure to act in fulfillment of a duty of care . . . as the owner or occupier of land' . . . ; (4) the misconduct did 'not relate to some matter over which the indemnitee exercised exclusive control.' "

The first and third of these requirements, as they did in *Vinnell,* operate in the instant case in favor of the indemnitor Winston. Also, indemnification provisions similar to those in the instant case were held not sufficient to cover the indemnitee's active negligence in *J. H. Pomeroy & Co.* v. *Soulé Steel Co.,* 156 Cal.App.2d 691 [320 P.2d 172]. We conclude that paragraphs 9 and 14 of the Winston agreement did not indemnify general contractor Baldwin against damages resulting from its own acts of affirmative negligence and that the trial judge's directed verdict against both Sacramento and Winston must be reversed.

Appellant Winston, citing *Cahill Bros., Inc.* v. *Clementina Co., supra,* contends that the trial court should have found, as a matter of law, that Baldwin actively participated in the negligent conduct proximately resulting in Steele's injury

and that it was error to deny appellants' motions for judgment notwithstanding the verdict. We do not agree. In *Cahill*, the same individual responsible for the negligent omission resulting in the injury was acting in a dual managerial capacity for both the general contractor and the subcontractor. He actively supervised the construction of the barricade which proved inadequate as a safeguard. It was, therefore, inconceivable that the indemnitee could be any more passively negligent than the indemnitor.

As we have noted above, in considering appellants' motions for a judgment notwithstanding the verdict, the evidence must be viewed in a light most favorable to respondent Baldwin. The questions of whether Phillips' conduct constituted affirmative negligence and if so, whether it contributed as a proximate cause to Steele's injury or was entirely superseded by the negligence of Winston and Sacramento, are more appropriately left to the jury. As stated in *Alisal Sanitary Dist.* v. *Kennedy,* 180 Cal.App.2d 69 [4 Cal. Rptr. 379]: "The nature and scope of the relationship between the plaintiff and the defendants; the obligations owing by one to the other; the extent of the participation of the plaintiff in the affirmative acts of negligence; the physical connection of the plaintiff, if any, with the defendants' acts of negligence by knowledge or acquiescence; or the failure of the plaintiff to perform some duty it may have undertaken by virtue of its agreement—are all questions of fact that should be left to the jury." (Pp. 79-80.)

We summarily dispose of the remaining issues in this case. Winston argues that its contract does not indemnify Baldwin against liability for Sacramento's negligent conduct because Sacramento was an independent contractor. The agreement holds Baldwin harmless not only for the negligent conduct of Winston's "employees" but also its "agents" and further requires that its "representatives" comply with all regulations and statutes relating to working conditions. We interpret the term "agent" as used in the context of this agreement to cover more than the technical employees and hold that Winston cannot avoid its indemnity obligation to Baldwin by subcontracting its work out to other independent contractors (*Kuntz* v. *Del E. Webb Constr. Co.,* 57 Cal.2d 100, 105 [18 Cal.Rptr. 527, 368 P.2d 127]; *Woolen* v. *Aerojet General Corp.,* 57 Cal.2d 407, 410 [20 Cal.Rptr. 12, 369 P.2d 708]; *Jean* v. *Collins Constr. Co.,* 215 Cal.App.2d 410, 417-418 [30 Cal.Rptr. 149]).

We see no merit in appellants' contention that the respondent is foreclosed from relying on the principle of noncontractual implied indemnity because it was not stated as an issue in the pretrial order.[4] The complaint alleged a cause of action for implied indemnity. Furthermore, the extensive colloquies at the trial between court and counsel indicate that the parties extended the issues and that the trial proceeded on the theory of implied as well as contractual indemnity (*Collison* v. *Thomas,* 55 Cal.2d 490, 498 [11 Cal.Rptr. 555, 360 P.2d 51]).

As to Winston's contention that any provision requiring it to indemnify Baldwin against its negligence is against public policy, *Goldman* v. *Ecco-Phoenix Elec. Corp., supra,* expressly held to the contrary and pointed out that *Tunkl* v. *Regents of the University of California,* 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441], does not purport to invalidate indemnity agreements.

The judgment entered on the directed verdict in favor of Baldwin and against Winston and Sacramento is reversed; the orders denying Winston's and Sacramento's motions for judgment notwithstanding the verdict are affirmed; the appeal from the order denying Winston's motion for a nonsuit is dismissed. Each party to bear its own costs.

Shoemaker, P. J., and Agee, J., concurred.

A petition for a rehearing was denied September 16, 1965, and respondent's petition for a hearing by the Supreme Court was denied October 13, 1965.

---

[4]California Rules of Court, Pretrial and Trial Rules, rule 216.