In re TRANSWORLD TELECOMMU-
NICATIONS, INC., Debtor.

Transworld Telecommunications,
Inc., Plaintiff,

v.

Pacific Mezzanine Fund,
L.P., Defendant.

No. 2:00cv0667 ST.
Bankruptcy No. 97C–31618.
Adversary No. 98PC–2089.

United States District Court,
D. Utah,
Central Division.

Jan. 9, 2001.

Blake D. Miller, Ballard Spahr Andrews & Ingersoll, Salt Lake City, UT, for plaintiff.

Duane H. Gillman, McDowell & Gillman PC, Salt Lake City, Steven B. Sacks, Perkins Coie, San Francisco, CA, Robert B. Lochhead, Parr Waddoups Brown Gee & Loveless, Salt Lake City, UT, Rachel A. Silvers, San Francisco, CA, for defendant.

## ORDER

STEWART, District Judge.

Before the Court is Defendant's objections to the bankruptcy court's proposed findings of fact, conclusions of law, and judgment pursuant to 28 U.S.C. § 157(c)(1)(non–core proceedings). The matter came regularly for hearing on Tuesday, November 21, 2000, before the Honorable Ted Stewart. After oral argument, consideration of the memoranda submitted by the parties, de novo review of the record before the court, and the pertinent law, the Court hereby enters the following findings and order:

1. The cost of money ceiling for a particular financing is to be determined as of the date a loan commitment is issued, or as of the date of the first closing of the financing. 13 C.F.R. § 107.855(b). Furthermore, the term "cash" as used in 13 C.F.R. § 107.855(h) includes all cash payments that are required under the terms of the loan, including cash payments required to be made in the future. The Court interprets 13 C.F.R. § 107.855 as a measure designed to prevent SBIA lenders from charging excess interest rates, not just a measure designed to remedy a situation where excess payments have been made.

2. The Court finds that the loan extended by Pacific Mezzanine Fund exceeded the cost of money ceiling set forth in 13 C.F.R. § 107.855. The bankruptcy court's findings and conclusions in this respect are hereby adopted.

3. The Court finds that there is insufficient evidence in the record to support the argument that Transworld Telecommunications, Inc. relied upon the misrepresented loan balance declared by Pacific Mezzanine Fund. However, the Court nonetheless finds that Pacific did not represent to Transworld that it owed a sum certain on the loan, which sum certain was in excess of the cost of money ceiling. Pacific's attempted retraction of this representation after being accused of violating the lending regulations is not credible and is rejected. Accordingly, Pacific

is bound by its representations in the letters sent to Transworld regarding the amount outstanding on the loan.

4. The Court finds that the bankruptcy's court's remedy wherein it recommended a judgment in the amount of $599,106.00 as the statutory penalty of twice the interest paid, (15 U.S.C.§ 687(i)(4)(B)), and a judgment that Pacific return the promissory notes secured as collateral of the loan, or if such promissory notes are sold, that Pacific return to Transworld all proceeds plus interest of the sale of the promissory notes, (15 U.S.C. § 687(i)(4)(B)), is the correct remedy mandated by the law. The bankruptcy's recommendation is, therefore, adopted in this respect. Pacific is hereby ordered to pay Transworld $599,106.00 as the statutory penalty of twice the interest actually paid. Furthermore, Pacific is ordered to return the Wireless Holdings note and the Wireless Cable note to Transworld, or if the notes were sold, then Pacific is ordered to return all proceeds from the sale of these notes, plus fourteen percent accruing from the date of such sale, to Transworld.

SO ORDERED.

United States Bankruptcy Court
for the District of Utah

PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT PURSUANT TO 28 U.S.C. § 157(c)(1)

This matter came on for trial before the Honorable Glen E. Clark, Chief Judge, United States Bankruptcy Court, on May 10, 2000. Blake D. Miller appeared on behalf of Thomas A. Howard, Trustee of The TTI Trust; Steven B. Sacks and Duane H. Gillman appeared on behalf of Pacific Mezzanine Fund, L.P.

## FINDINGS OF FACT

1. Transworld Telecommunications, Inc., ("TTI") is a Pennsylvania corporation which, prior to the confirmation of its plan of reorganization in this case, had its principal place of business in Salt Lake City, Utah. (Pretrial Order.)

2. Thomas A. Howard, Trustee of The TTI Trust (the "Trustee"), is the successor in interest to TTI of all claims and interests related to this proceeding.

3. Pacific Mezzanine Fund, L.P., ("PMF") is licensed under the Small Business Investment Act ("SBIA") and is engaged in the business of providing federally leveraged loans to qualified small businesses.

4. On June 28, 1996, TTI and PMF entered into a loan agreement and related debt and security instruments under which PMF loaned $2,500,000 to TTI (the "Loan"). (Pretrial Order.)

5. The Loan was extensively negotiated by the parties at arm's length. Both parties were represented by experienced counsel of their choosing. (Pretrial Order.)

6. The Loan provides that California law applies to its interpretation.

7. Under applicable federal law, the cost of money ceiling for the Loan is 14 percent per annum. (Pretrial Order.)

8. The Loan Agreement provides that the rate of interest payable on the Loan shall in no event exceed the maximum rate permissible under applicable law.

9. There is no evidence in the record that the interest rate or any other material term of the Loan was ever adjusted in order to prevent the Loan from exceeding the SBIA cost of money ceiling.

10. The Loan Agreement provides for TTI to pay accrued interest each quarter and for interest to be compounded quarterly.

11. In the Loan Agreement, TTI represented and warranted that the Loan Agreement and the other agreements were legal, valid, and binding obligations.

12. In the Loan Agreement, TTI agreed that it would indemnify, defend, and hold PMF harmless.

13. PMF received the following collateral for the Loan (the "Collateral").

(1) A security interest in a "put option" owned by TTI which required Videotron USA, Inc., to purchase TTI's 200 shares of Videotron (Bay Area), Inc., for a price of not less than $2,600,000 (the "VBAI Put").

(2) A security interest in a Promissory Note, dated April 1, 1995, from Wireless Holdings, Inc., to TTI in the principal amount of $2,375,415 (the "WHI Note").

(3) A security interest in a Promissory Note, dated June 28, 1996, from Wireless Cable and Communications, Inc., ("WCCI") to TTI in the principal amount of $1,000,000 (the "WCCI Note"). (Pretrial Order.)

14. PMF's interest in the Collateral was duly perfected under applicable law. The WHI Note and the WCCI Note were assigned to PMF in writing, and PMF took possession of both Notes. On the date of the Loan closing, PMF received:

(1) Six months non-refundable interest of $175,000;

(2) A loan and application fee of $126,600;

(3) A Warrant Purchase Agreement and a warrant to acquire shares of TTI common stock (the "Warrant"); and

(4) 145,833 shares of WCCI stock for the cost of $1,600 (the "WCCI Stock"). (Pretrial Order.)

15. The loan and application fee of $126,600 exceeded the maximum allowed by SBIA regulation in the amount of $1,600.

16. On June 28, 1996, the date the Loan closed, the Loan exceeded the cost of money ceiling because of the $1,600 excess loan and application fee caused the cost of money for the Loan to equal +$1,600.

17. The parties agreed that the fair market value of the 145,833 shares of WCCI stock was $5,000 on the date of issuance.

18. On January 6, 1997, TTI paid to PMF $4,315 on account of the Loan. (Pretrial Order.)

19. TTI failed to pay the interest payment due on April 1, 1997. (Pretrial Order.)

20. By letter dated April 15, 1997, PMF notified TTI that TTI was in default of the Loan, the Loan had been accelerated, and that PMF demanded payment in full. (Pretrial Order.)

21. With TTI's consent, PMF exercised the VBAI Put that was part of the Collateral. Consequently, TTI's one-half ownership interest in VBAI was purchased by Videotron for $2,600,000. (Pretrial Order.)

22. On May 2, 1997, PMF received the entire proceeds of the VBAI Put in the amount of $2,600,000. (Pretrial Order.)

23. Under the Warrant Purchase Agreement, TTI was required to purchase the warrant received by PMF because TTI had not sold certain assets until six months or more after the Loan was made. The repurchase price, at that time, was $2 per share. As a result of PMF's contention that TTI was in default at the time of the warrant repurchase, the number of shares subject to repurchase was increased to

187,500 shares to make the total repurchase price $375,000. (Pretrial Order.)

24. PMF applied the $2,600,000 VBAI Put proceeds as follows:

(1) $120,238.94 to accrued interest on the loan;

(2) $8,000 to legal expenses;

(3) $375,000 for the warrant purchase obligation; and

(4) $2,096,761.06 to principal. (Pretrial Order.)

25. After applying the above proceeds to the Loan, the outstanding balance on the Loan on May 5, 1997, was:

| | | |
|---|---|---|
| Outstanding principal prior to allocation | = | $2,500,000.00 |
| Proceeds applied to principal 5/5/1997 | = | $2,096,761.06 |
| Outstanding Loan balance on 5/5/1997 | = | $403,238.94 |

26. 13 CFR § 107.855(h) defines the procedure used to evaluate compliance with the cost of money ceiling rule for SBIA lenders. To evaluate compliance with the cost of money ceiling, one must discount the cash flows back to the first disbursement date using the cost of money ceiling as the discount rate. If the result is zero or less, the financing is within the cost of money ceiling; if the result is greater than zero, the financing exceeds the cost of money ceiling.

27. With a loan balance of $403,238.94 on May 5, 1997, the Loan violates the cost of money ceiling under SBIA regulations because the discounted cash flows exceed the cost of money ceiling of 14 percent as follows:

| Event | Date | Dollars | Discount Value | Present Value |
|---|---|---|---|---|
| Loan | 6/28/96 | $(2,500,000) | 1.0000 | ($2,500,000) |
| Excess Fee | 6/28/96 | $1,600 | 1.0000 | $1,600 |
| Prepaid interest | 6/28/96 | $175,000 | 1.0000 | $175,000 |
| Interest Paid | 1/06/97 | $4,315 | 0.9290 | $4,008 |
| Interest Paid | 5/05/97 | $120,238 | 0.8876 | $106,723 |
| Warrant Purchase | 5/05/97 | $300,000 | 0.8876 | $266,280 |
| Principal Paid | 5/05/97 | $2,096,761 | 0.8876 | $1,861,085 |
| Loan Balance | 5/05/97 | $403,238 | 0.8876 | $357,914 |
| Total | | | | +$272.610 |

28. In order for the Loan to comply with the cost of money ceiling, the Loan balance on May 5, 1997, should have been no more than $96,106 as calculated below:

| Event | Date | Dollars | Discount Value | Present Value |
|---|---|---|---|---|
| Loan | 6/28/96 | $(2,500,000) | 1.0000 | ($2,500,000) |
| Excess Fee | 6/28/96 | $1,600 | 1.0000 | $1,600 |
| Prepaid interest | 6/28/96 | $175,000 | 1.0000 | $175,000 |
| Interest Paid | 1/06/97 | $4,315 | 0.9290 | $4,008 |
| Interest Paid | 5/05/97 | $120,238 | 0.8876 | $106,723 |
| Warrant Purchase | 5/05/97 | $300,000 | 0.8876 | $266,280 |
| Principal Paid | 5/05/97 | $2,096,761 | 0.8876 | $1,861,085 |
| Loan Balance | 5/05/97 | $96,106 | 0.8876 | $85,304 |
| Total | | | | $ 0 |

29. PMF's letter dated June 24, 1997, states that $413,667.91 was the outstanding balance on the Loan as of June 30, 1997. By this letter, PMF also gave notice of the intention to dispose of the two Collateral notes by private sale or otherwise.

30. With a loan balance of $413,667.91 on June 30, 1997, the Loan violates the cost of money ceiling under SBIA regulations because the discounted cash inflows and outflows exceed the cost of money ceiling of 14 percent as follows:

| Event | Date | Dollars | Discount Value | Present Value |
|---|---|---|---|---|
| Loan | 6/28/96 | $(2,500,000) | 1.0000 | ($2,500,000) |
| Excess Fee | 6/28/96 | $1,600 | 1.0000 | $1,600 |
| Prepaid interest | 6/28/96 | $175,000 | 1.0000 | $175,000 |
| Interest Paid | 1/06/97 | $4,315 | 0.9290 | $4,008 |
| Interest Paid | 5/05/97 | $120,238 | 0.8876 | $106,723 |
| Warrant Purchase | 5/05/97 | $300,000 | 0.8876 | $266,280 |
| Principal Paid | 5/05/97 | $2,096,761 | 0.8876 | $1,861,085 |
| PMF Demand Ltr | 6/30/97 | $413,667 | 0.8688 | $359,394 |
| Total | | | | +$274,090 |

31. In order for the Loan to comply with the cost of money ceiling, the Loan balance on June 30, 1997, should have been no more than $98,186 as calculated below:

| Event | Date | Dollars | Discount Value | Present Value |
|---|---|---|---|---|
| Loan | 6/28/96 | $(2,500,000) | 1.0000 | ($2,500,000) |
| Excess Fee | 6/28/96 | $1,600 | 1.0000 | $1,600 |
| Prepaid interest | 6/28/96 | $175,000 | 1.0000 | $175,000 |
| Interest Paid | 1/06/97 | $4,315 | 0.9290 | $4,008 |
| Interest Paid | 5/05/97 | $120,238 | 0.8876 | $106,723 |
| Warrant Purchase | 5/05/97 | $300,000 | 0.8876 | $266,280 |
| Principal Paid | 5/05/97 | $2,096,761 | 0.8876 | $1,861,085 |
| Loan Balance | 5/05/97 | $98,186 | 0.8688 | $85,304 |
| Total | | | | $ 0 |

32. By another letter, also dated June 24, 1997, PMF notified TTI that PMF would retain the Collateral notes in satisfaction of the obligations under the Loan (the "Retention Letter"). (Pretrial Order.)

33. The information about how PMF applied the $2,600,000 VBAI Put proceeds against accrued interest, expenses, warrant purchase obligation, and principal was

The top-right table (before item 29):

| Event | Date | Dollars | Discount Value | Present Value |
|---|---|---|---|---|
| Loan | 6/28/96 | $(2,500,000) | 1.0000 | ($2,500,000) |
| Excess Fee | 6/28/96 | $1,600 | 1.0000 | $1,600 |
| Prepaid interest | 6/28/96 | $175,000 | 1.0000 | $175,000 |
| Interest Paid | 1/06/97 | $4,315 | 0.9290 | $4,008 |
| Interest Paid | 5/05/97 | $120,238 | 0.8876 | $106,723 |
| Warrant Purchase | 5/05/97 | $300,000 | 0.8876 | $266,280 |
| Principal Paid | 5/05/97 | $2,096,761 | 0.8876 | $1,861,085 |
| Loan Balance | 5/05/97 | $96,106 | 0.8876 | $85,304 |
| Total | | | | $ 0 |

not shared by PMF with TTI at the time of the allocation.

34. At all material times, PMF knew, or should have known, the balance due under the Loan.

35. On June 24, 1997, because PMF had the unilateral right to allocate expenses under the Loan agreement, only PMF was in the position to know the exact outstanding balance of the Loan.

36. On June 24, 1997, only PMF had access to all of the information necessary to calculate the actual remaining balance of the Loan.

37. TTI relied upon PMF's letter of June 24, 1997, which stated that the outstanding balance of the Loan as of June 30, 1997, was $413,667.91.

38. Because TTI relied on the June 24, 1997, correspondences from PMF stating that the outstanding balance of the Loan as of June 30, 1997, was $413,667.91, TTI did not challenge PMF's retention of the Collateral.

39. No further cash payments from TTI were received by PMF.

40. PMF elected to retain the Collateral while demanding a loan balance of $413,667.91 by letter dated June 24, 1997, and did in fact retain the Collateral on July 18, 1997.

41. PMF did not sell either of the two Collateral notes. No response or objection to the Retention Letter having been received on July 18, 1997, PMF retained the Collateral notes in satisfaction of the remaining amounts due under the Loan. (Pretrial Order.)

42. Total interest paid on the Loan was $299,553.

## CONCLUSIONS OF LAW

1. "Cost of money" means the interest and other consideration that a licensee un-der the Small Business Investment Act of 1958 receives from a small business. 13 C.F.R. § 107.855.

2. 13 C.F.R. § 107.855 which defines "cost of money" is drafted broadly and includes all interest, points, discounts, fees, royalties, profit participation, and any other consideration received from a small business, except for the specific exclusions set forth in 13 C.F.R. § 107.855(g).

3. PMF, as a Licensee under the Small Business Investment Act of 1958, must comply with the cost of money regulations and all applicable regulations, accounting guidelines, and valuation guidelines promulgated by the Small Business Administration. 13 C.F.R. § 107.20.

4. The cost of money for a particular financing is to be determined as of the date a loan commitment is issued, or as of the date of the first closing of the financing. 13 C.F.R. § 107.855(b).

5. The term "Cash" as used in 13 C.F.R. § 107.855(h) includes all cash payments that are required under the terms of the loan, including cash payments required to be made in the future.

6. It is not necessary to wait until all cash payments have been received by the lender in order to determine the cost of money of a certain financing for purposes of 13 C.F.R. § 107.855.

7. It is not necessary to wait until all cash payments have been received by the lender in order to determine whether a certain financing exceeds the cost of money ceiling for purposes of 13 C.F.R. § 107.855(h).

8. It is possible to determine if a loan exceeds the cost of money ceiling at any time during the term of a loan by identifying cash inflows and cash outflows required under the terms of the loan agreement and discounting the projected cash

flows back to the first disbursement date using the cost of money ceiling as the discount rate. 13 C.F.R. § 107.855(h).

*Excess Loan Application Fee*

9. The loan and application fee of $126,600 exceeded the maximum allowed by SBIA regulation by the sum of $1,600.

10. The $1,600 portion of the loan and application fee that exceeded the maximum allowed by regulation should be included in the calculation of the cost of money of the Loan. 13 C.F.R. § 107.855(f).

11. On June 28, 1996, the date the Loan closed, the Loan exceeded the cost of money ceiling because the $1,600 excess loan and application fee caused the cost of money for the Loan to equal +$1,600.

12. Because the excess loan and application fee was paid as of the date of the closing of the Loan, and no downward adjustment was made in the interest rate for the loan, the cost of money on the Loan exceeded the cost of money ceiling beginning June 28, 1996, and throughout the term of the Loan.

*Allocation of Proceeds of May 5, 1997*

13. On May 5, 1997, PMF applied the $2,600,000 VBAI Put proceeds as follows:

(1) $120,238.94 to accrued interest on the loan;

(2) $8,000 to legal expenses;

(3) $375,000 for the warrant purchase obligation; and

(4) $2,096,761.06 to principal.

14. After applying the above referenced amounts to the Loan, the outstanding balance on the Loan on May 5, 1997, was:

| | | |
|---|---|---|
| Outstanding principal prior to allocation | = | $2,500,000.00 |
| Proceeds applied to principal 5/5/1997 | = | $2,096,761.06 |
| Outstanding Loan balance after allocation | = | $403,238.94 |

15. The $300,000 non-default amount of the warrant purchase price should be included in the calculation of the cost of

money of the Loan. 13 C.F.R. § 107.855(f).

16. The $75,000 default portion of the warrant purchase price should not be included in the calculation of the cost of money of the Loan.

17. The net value of the WCCI Stock should not be included in the calculation of the cost of money of the Loan.

18. The value of the collateral that was retained upon foreclosure by PMF on July 18, 1997, should not be included in the cost of money calculation.

19. With a loan balance of $403,238.94 on May 5, 1997, the Loan violates the cost of money ceiling under SBIA regulations because the discounted cash inflows and outflows exceed the cost of money ceiling of 14 percent as follows:

| Event | Date | Dollars | Discount Value | Present Value |
|---|---|---|---|---|
| Loan | 6/28/96 | $(2,500,000) | 1.0000 | ($2,500,000) |
| Excess Fee | 6/28/96 | $1,600 | 1.0000 | $1,600 |
| Prepaid interest | 6/28/96 | $175,000 | 1.0000 | $175,000 |
| Interest Paid | 1/06/97 | $4,315 | 0.9290 | $4,008 |
| Interest Paid | 5/05/97 | $120,238 | 0.8876 | $106,723 |
| Warrant Purchase | 5/05/97 | $300,000 | 0.8876 | $266,280 |
| Principal Paid | 5/05/97 | $2,096,761 | 0.8876 | $1,861,085 |
| Loan Balance | 5/05/97 | $403,238 | 0.8876 | $357,914 |
| Total | | | | +$272,610 |

20. In order for the Loan to comply with the cost of money ceiling, the Loan balance on May 5, 1997, should have been no more than $96,106 as calculated below:

| Event | Date | Dollars | Discount Value | Present Value |
|---|---|---|---|---|
| Loan | 6/28/96 | $(2,500,000) | 1.0000 | ($2,500,000) |
| Excess Fee | 6/28/96 | $1,600 | 1.0000 | $1,600 |
| Prepaid interest | 6/28/96 | $175,000 | 1.0000 | $175,000 |
| Interest Paid | 1/06/97 | $4,315 | 0.9290 | $4,008 |
| Interest Paid | 5/05/97 | $120,238 | 0.8876 | $106,723 |
| Warrant Purchase | 5/05/97 | $300,000 | 0.8876 | $266,280 |
| Principal Paid | 5/05/97 | $2,096,761 | 0.8876 | $1,861,085 |
| Loan Balance | 5/05/97 | $96,106 | 0.8876 | $85,304 |
| Total | | | | $ 0 |

*Demand Letters and Collateral Retention*

21. On June 24, 1997, only PMF had access to all of the information necessary to calculate the actual remaining balance of the Loan.

22. TTI relied upon PMF's letter of June 24, 1997, which stated that the out-

standing balance of the Loan as of June 30, 1997, was $413,667.91.

23. Because PMF acted upon it's two demand letters of June 24, 1997, to retain the Collateral Notes and continues to rely on the letters to support its retention of the collateral, PMF is bound by the statements contained within the demand letters of June 24, 1997, including the assertion that the outstanding balance of the Loan as of June 30, 1997, was $413,667.91.

24. Because (1) only PMF had access to the information necessary to calculate the actual remaining balance of the Loan on June 30, 1997; (2) PMF sent a written demand stating that the outstanding balance on the loan was $413,667.91 simultaneously with its notice of intent to retain the Collateral; (3) PMF acted on its stated intent to retain the Collateral; and (4) TTI relied to its detriment on PMF's statement that the Loan balance was $413,667.91, PMF is estopped from denying its representation. *Golden Day Schools, Inc. v. Department of Education*, 69 Cal.App.4th 681, 81 Cal.Rptr.2d 758 (1999).

25. With a loan balance of $413,667.91 on June 30, 1997, the Loan violates the cost of money ceiling under SBIA regulations because the discounted cash inflows and outflows exceed the cost of money ceiling of 14 percent as follows:

| Event | Date | Dollars | Discount Value | Present Value |
|---|---|---|---|---|
| Loan | 6/28/96 | $(2,500,000) | 1.0000 | ($2,500,000) |
| Excess Fee | 6/28/96 | $1,600 | 1.0000 | $1,600 |
| Prepaid interest | 6/28/96 | $175,000 | 1.0000 | $175,000 |
| Interest Paid | 1/06/97 | $4,315 | 0.9290 | $4,008 |
| Interest Paid | 5/05/97 | $120,238 | 0.8876 | $106,723 |
| Warrant Purchase | 5/05/97 | $300,000 | 0.8876 | $266,280 |
| Principal Paid | 5/05/97 | $2,096,761 | 0.8876 | $1,861,085 |
| PMF Demand Ltr | 6/30/97 | $413,667 | 0.8688 | $359,394 |
| Total | | | | $274,090 |

26. In order for the Loan to comply with the cost of money ceiling, the Loan balance on June 30, 1997, should have been no more than $98,186 as calculated below:

| Event | Date | Dollars | Discount Value | Present Value |
|---|---|---|---|---|
| Loan | 6/28/96 | $(2,500,000) | 1.0000 | ($2,500,000) |
| Excess Fee | 6/28/96 | $1,600 | 1.0000 | $1,600 |
| Prepaid interest | 6/28/96 | $175,000 | 1.0000 | $175,000 |
| Interest Paid | 1/06/97 | $4,315 | 0.9290 | $4,008 |
| Interest Paid | 5/05/97 | $120,238 | 0.8876 | $106,723 |
| Warrant Purchase | 5/05/97 | $300,000 | 0.8876 | $266,280 |
| Principal Paid | 5/05/97 | $2,096,761 | 0.8876 | $1,861,085 |
| Loan Balance | 5/05/97 | $98,186 | 0.8688 | $85,304 |
| Total | | | | $ 0 |

## Maximum Rate Provision

26. Because the $1,600 excess loan and application fee was paid at the date of the loan origination, the rate of interest payable on the Loan exceeded the maximum rate permissible under SBIA regulations beginning June 28, 1996, and throughout the term of the loan agreement.

27. Had the maximum rate provision of the Loan agreement actually been effective to prevent the Loan from exceeding the cost of money ceiling, on June 28, 1996, the maximum rate provision would have had the immediate effect of causing the interest rate or some other material term of the Loan to be adjusted so that the Loan would not violate the SBIA cost of money ceiling.

28. After having received the $126,600 loan and application fee, $1,600 of which exceeded the maximum allowed by SBIA cost of money regulation, on June 28, 1996, PMF applied the sum of $175,000.00 toward prepaid interest on the loan. PMF applied the interest prepayment without downwardly adjusting the Loan's interest rate to avoid exceeding the cost of money ceiling despite the Loan's maximum rate provision.

29. On January 6, 1997, PMF accepted an interest payment of $4,315 on the loan. PMF accepted the interest payment without downwardly adjusting the Loan's interest rate in order to avoid exceeding the cost of money ceiling despite the Loan's maximum rate provision.

30. On May 5, 1997, PMF applied the sum of $117,144.11 toward interest on the loan. PMF applied the interest payment without downwardly adjusting the Loan's interest rate in order to avoid exceeding

the cost of money ceiling despite the Loan's maximum rate provision.

31. Without downwardly adjusting the interest rate or any other material term of the loan after accepting and applying the payments as it did, PMF is estopped from claiming that the maximum interest rate provision of the Loan documents ever actually operated to prevent the Loan from violating the cost of money ceiling.

32. The Loan's maximum rate provision was never used by the parties, was never effective to reduce the interest rate of the Loan, was never effective to modify any terms of the loan, and did not operate to prevent the Loan from violating the SBIA cost of money ceiling.

33. A lender cannot charge an usurious rate with impunity by making that rate conditional upon its legality and relying upon the illegal rate's automatic rescission when discovered and challenged by the borrower. *Swindell v. Federal National Mortgage Association,* 330 N.C. 153, 409 S.E.2d 892 (1991). To approve this type of savings clause "might encourage lenders to charge excessive interest, since, even if caught, the only penalty would be the loss of the excess interest." *Jersey Palm–Gross, Inc. v. Paper,* 658 So.2d 531, 535 (Fla.1995). When a lender demands interest in excess of the legal rate, the action is per se usurious and cannot be condoned by any declaration of lack of intent to violate the law. *Golden v. Lyons,* 151 Conn. 21, 193 A.2d 487 (1963). If the amount of interest charged has exceeded the maximum interest that may be charged on the debt, the savings clause cannot be given effect. *Victoria Bank & Trust Co. v. Brady,* 779 S.W.2d 893 (Tex.App.1989).

*Indemnification and Limitation of Liability Provisions*

34. As a matter of public policy, a SBIA lender must not be able to defeat SBA regulations by incorporating into loan agreements hold harmless provisions, indemnification provisions, or maximum rate provisions that absolve the lender when it is discovered that the loan violates the cost of money regulations.

35. The purpose of the SBIA cost of money regulations is to protect the small business borrower. A claim based upon a lender's violation of SBIA regulations cannot be waived either by indemnification or by limitation of liability agreement. *See Can–Am Petroleum Company v. Beck,* 331 F.2d 371 (10th Cir.1964) (Claims based upon the remedial aspects of the Federal Securities Act of 1933 cannot be waived either directly or indirectly).

36. A SBIA lender must not be able to defeat the regulatory authority of the SBA by incorporating indemnification or hold harmless provisions into its loan agreements that would insulate the lender from the remedial effects of SBIA regulations and thereby permit the lender to ignore the applicable law. "[O]ne who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction." *Gibbs & Sterrett Manuf's Co. v. Brucker,* 111 U.S. 597, 601, 4 S.Ct. 572, 28 L.Ed. 534 (1884).

37. The limitation of liability and the indemnification provisions of the Loan documents do not protect PMF from its own violations of SBIA regulations. The Loan documents do not clearly and explicitly state that PMF will be indemnified or held harmless from the effects of its own violations of SBIA regulations. *Baldwin Contracting Company v. Winston Steel Works, Inc.,* 236 Cal.App.2d 565, 46 Cal.Rptr. 421 (1965).

38. Because PMF's demand letter of June 24, 1997, so grossly overstates the outstanding loan balance (more than four times the maximum allowed by law),

PMF's actions raise to the level of gross negligence or willful misconduct. Pursuant to Section 8.01(a) of the Loan agreement, PMF has no right to be indemnified or held harmless for any liabilities, losses, damages, penalties, judgments, claims, costs, or expenses.

### RECOMMENDATION

Based upon the above, it is recommended that Judgment be awarded as follows:

1. TTI is awarded and PMF is liable for the statutory penalty of twice the interest paid under the Loan. 15 U.S.C. § 687(i)(4)(B). Because $299,553 interest was actually paid under the Loan, TTI is awarded a judgment in the amount of $599,106.

2. The Trustee is entitled to an order requiring PMF to return the Collateral Notes, or the proceeds of such notes. If PMF has received proceeds from the Collateral Notes, PMF shall return to TTI all proceeds plus interest at the rate of 14 percent from the date of receipt of the proceeds by PMF to the date of turnover by PMF to TTI.

3. Upon return of the Collateral Notes or proceeds therefrom, PMF is entitled to be paid the remaining outstanding balance or the Loan. Such balance is to be computed at the nondefault interest rate of 14 percent.

4. Having rejected PMF's indemnity and limitation of liability clauses, each party is to bear its own fees and costs.

GLEN E. CLARK, Chief Judge.

Dated this 23 day of June, 2000.